2005 WY 71

Yvonne SNIDER; Sherry Fields and Lee Fields, Appellants (Petitioners),

v.

Fred KIRCHHEFER and Donita Kirchhefer, Appellees (Respondents).

No. 04–140.

Supreme Court of Wyoming.

June 30, 2005.

Representing Appellants: F. Scott Peasley, Douglas, Wyoming.

Representing Appellees: Peter C. Nicolaysen and Pamela M. Brondos of Peter C. Nicolaysen & Associates, P.C., Casper, Wyoming. Argument by Mr. Nicolaysen.

Before HILL, C.J., and GOLDEN, and KITE, JJ., and GRANT, D.J., and STEBNER, D.J., Retired.

GOLDEN, Justice.

[¶ 1] Fred and Donita Kirchhefer (the Kirchhefers) filed a petition for the abandonment of a water right attached to lands owned by Yvonne Snider and Sherry and Lee Fields (Appellants). The board of control granted that petition and ordered the water right abandoned. On appeal Appellants claim that they did not voluntarily abandon their right and that the Kirchhefers did not prove that they had standing to file a petition for abandonment. We reverse.

## ISSUES

[¶ 2] Appellants assert four issues:

I. Did the Appellants/Contestees voluntarily abandon their water right?

II. Does a contestee in a water abandonment case have a right of resuscitation after five (5) years of non-use and prior to the date a contestant files a petition of abandonment?

III. Can a contestant in a water abandonment action involving allegations of non-use, who has always received his appropriated share of water, prevail without offering volumetric data or simulations to show the affect of reactivating contestees' water right?

IV. Was there substantial evidence to support the Board of Control's orders of abandonment.

The Kirchhefers respond with the following two issues:

1. Whether the Board of Control erred in determining Appellants voluntarily abandoned their water right.

2. Whether the Board of Control erred in determining that [the Kirchhefers'] junior water right might be injured upon reactivation or benefited by abandonment of the senior water right.

## FACTS

[¶ 3] The Kirchhefers and the Appellants own land in Converse County, Wyoming. The Kirchhefers' land is just south of Appellants' land. The Kirchhefers purchased their land in 1989. Appellant Snider purchased her land (Snider land) in 1995 and in 1999 sold a portion of that land to her daughter and son-in-law, Sherry and Lee Fields. Six Mile Creek, a tributary to the North Platte River, flows in a northeasterly direction through the northern portion of the Kirchhefers' land. Six Mile Creek does not cross Snider land.

[¶ 4] However, the Snider land has a 1915 water appropriation right to receive .33 cubic feet per second (c.f.s.) from Six Mile Creek for irrigation purposes. This appropriation, known as the Minnie F. Barrow appropriation, permits the diversion of water from Six Mile Creek at a point on the Kirchhefers' land. The water then travels through the Budget No. 2 Ditch, a portion of which is on the Kirchhefers' land, to reach Snider land. Accompanying the Minnie F. Barrow appropriation, by order of the Converse County District Court, is an easement and right of way across the Kirchhefers' land to construct, maintain, and repair the Budget No. 2 Ditch. There has been no beneficial use of the water under the Minnie F. Barrow appropriation for at least five years. Indeed, before August 30, 2001, portions of the Budget No. 2 Ditch had fallen into such a state of disrepair that the ditch could not convey the water to the appropriated lands.

[¶ 5] Although Six Mile Creek runs through their land, the Kirchhefers do not have a surface appropriation right for Six Mile Creek. However, the Kirchhefers have a ground water permit for six gallons per minute from the Kirchhefer Spring No. 1, a well located on the Kirchhefers' land. The well has a permit dated December 5, 1995. This well is built into the creek bank of Six Mile Creek and is approximately 100 feet upstream from the point of diversion for the Budget No. 2 Ditch. The well is used for watering the Kirchhefers' livestock, yard, garden, and trees and for other domestic purposes. The Kirchhefers have actively used the water from this well since its creation. Prior to the Kirchhefers' ownership a small duck pond was constructed on the creek. The construction of the pond and several spillways altered the original flow of Six Mile Creek so that it did not flow past the historical Budget No. 2 Ditch point of diversion.

[¶ 6] On August 29, 2001, Appellants entered the Kirchhefers' property with a backhoe and began repairing the Budget No. 2 Ditch in order to repair the ditch so that it could convey water from Six Mile Creek. The work progressed towards the point on Six Mile Creek that David Andrews, the local hydrographer-commissioner, had indicated was the point of diversion.[1] However, shortly before the work was completed, the Kirchhefers began to object to the construction activities. The Kirchhefers stated reason for concern was they believed the Appellants were outside their easement and at the wrong point of diversion.

[¶ 7] In order to stop the activities, the Kirchhefers called the sheriff, and Donita Kirchhefer stood in front of the backhoe. As a result, the construction activities were delayed for the rest of the day. The following day the Kirchhefers filed a temporary restraining order to stop the construction activities. This order was granted and presented to the backhoe operator as he was resuming the construction activities, once again halting the activities. Then on August 31, 2001, the Kirchhefers filed a petition for abandonment of the Minnie F. Barrow appropriation alleging that the appropriators had not used the appropriation for more than five years. Following this filing, the Appellants did not try to complete their construction activities and beneficial use was never restored.

[¶ 8] On January 25, 2002, the board of control held a hearing to consider the matter, and both sides presented evidence. On May 9, 2002, the board ordered the abandonment

---

1. Andrews had shown Appellants what he believed to be the point of diversion and proper location of the ditch but advised Appellants to get a survey to assure that he was correct. Appellants did not do so. Later surveys revealed that Appellants had strayed from the easement in some areas.

of the Minnie F. Barrow appropriation. The Appellants appealed this order to the district court. The district court found that the board's order contained no findings of fact or conclusions of law to establish a reasonable likelihood that abandonment would benefit or injure the Kirchhefers' water right. The district court therefore remanded for the board to reconsider the matter.

[¶ 9] On remand, the board met again to discuss the issue. The board did not receive any further evidence, but the parties were allowed to submit written closing arguments. On August 28, 2003, the board by written order found that the Kirchhefers established that there is a reasonable likelihood that their water right would be injured by reactivation and benefited by abandonment. The Appellants again sought review from the district court. This time the district court found that the appropriate findings had been made and affirmed that decision. Appellants then appealed to this Court.

## STANDARD OF REVIEW

[¶ 10] We review administrative actions pursuant to the Wyoming Administrative Procedures Act. *See* Wyo. Stat. Ann. § 16–3–114 (LexisNexis 2003). In this instance the substantial evidence test is the proper standard of review.

The substantial evidence test is the appropriate standard of review in appeals from Wyoming Administrative Procedures Act contested case proceedings when factual findings are involved and both parties submit evidence. [*Kuntz–Dexter v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2002 WY 101, 49 P.3d 190 (Wyo. 2002)] at ¶ 10 (citing *Newman v. Wyo. Workers' Safety and Comp. Div.*, 2002 WY 91, ¶ 22, 49 P.3d 163, ¶ 22 (Wyo.2002)). Because both parties presented cases-in-chief, we apply the substantial evidence standard. We afford respect and deference to a hearing examiner's findings of fact if they are supported by substantial evidence. *Kuntz–Dexter,* ¶ 10. Our task is to examine the entire record to determine whether substantial evidence supported the hearing examiner's findings. We will not substitute our judgment for

that of the hearing examiner when substantial evidence supports his decision. *Id.*

Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.* When only the party with the burden of proof submits evidence in the contested case proceeding and that party does not ultimately prevail, the arbitrary or capricious standard governs the judicial review of that agency decision. *Id.* Even if the factual findings are found to be supported by substantial evidence, the ultimate agency decision may be found to be arbitrary or capricious for other reasons. *Id.*

We do not examine the record only to determine if there is substantial evidence to support the hearing examiner's decision, but we must also examine the conflicting evidence to determine if the hearing examiner could have reasonably made its finding and order upon all of the evidence before it. *Id.* A hearing examiner's conclusions of law are afforded no special deference and will be affirmed only if truly in accord with law. *Id.; State ex rel. Wyo. Workers' Comp. Div. v. Barker,* 978 P.2d 1156, 1159 (Wyo.1999).

*Iverson v. Frost Construction,* 2003 WY 162, ¶¶ 11–13, 81 P.3d 190, ¶¶ 11–13 (Wyo.2003).

## DISCUSSION

[¶ 11] The abandonment of a water right is governed by Wyo. Stat. Ann. § 41–3–401 (LexisNexis 2003). The relevant portion of this statute provides:

(a) Where the holder of an appropriation of water from a surface, underground or reservoir water source fails, either intentionally or unintentionally, to use water therefrom for the beneficial purposes for which it was appropriated, whether under an adjudicated or unadjudicated right, during any five (5) successive years, he is considered as having abandoned the water right and shall forfeit all water rights and privileges appurtenant thereto....

* * * *

(b) When any water user who might be benefitted by a declaration of abandonment of existing water rights or who might

be injured by the reactivation of the water right, desires to bring about a legal declaration of abandonment, he shall present his case in writing to the board of control. . . . The following persons have standing to petition the state board of control to declare the abandonment of existing water rights under this section:

(i) Any person who has a valid adjudicated water right or is the holder of a valid permit from the same source of supply which is equal to or junior in date of priority to the right for which abandonment is sought[.]

We have interpreted § 41–3–401(b) to mean that in order to have standing to petition for abandonment, a water user must allege and prove three essential elements: 1) that he possesses a valid water right of equal or junior status to the water right sought to be abandoned; 2) that the water right relied upon by the petitioner and the water right for which a declaration of abandonment is sought are from the same source of supply; and 3) that the petitioner stands to benefit from a declaration of abandonment or to sustain injury by reactivation of the contested water right. *Schulthess v. Carollo,* 832 P.2d 552, 557 (Wyo.1992); *see also Joe Johnson Co. v. Wyoming State Board of Control,* 857 P.2d 312, 316–17 (Wyo.1993). At issue in the instant appeal is the third element.

[¶ 12] In considering the third element further, we have held that the petitioner is required to have a "tangible" rather than simply a "theoretical" interest at stake. *Schulthess,* at 559. While the potential injury need not be a certainty, it must be one that is not too remote or speculative. *Goshen Irrigation Dist. v. Wyoming State Board of Control,* 926 P.2d 943, 948 (Wyo.1996). Indeed, although the statute uses the word "might," the "tangible interest at stake" requirement dictates that the petitioner allege and prove a *reasonable likelihood* that the abandonment will benefit or resuscitation will injure the petitioner's water right. *Schulthess,* at 559 (emphasis added). We hold, in this instance, there was not sufficient evidence to show a reasonable likelihood that the Kirchhefers' water right would be bene-

fited by abandonment or injured by Appellants' resuscitation.

[¶ 13] Regarding the Kirchhefers' benefit or injury, the board originally found:

11. THAT petitioners might be injured by contestees' reactivated use of the Budget No. 2 Ditch. A call for regulation by the reactivated senior priority Budget No. 2 Ditch could cause the junior priority Kirchhefer Spring to be denied water, and thus cause injury to the petitioners (Wyoming Statutes 41–3–401, 1977). At the public hearing, the petitioners testified that they might be injured by the reactivation of the Budget No. 2 Ditch due to the junior priority of their spring development, and that they would be benefited by the declaration of abandonment. Hydrographer Commissioner, Dave Andrews testified under subpoena that if the Kirchhefer Spring were determined to be a common source with the creek he might have to regulate it if a call for regulation were received (Transcript page 224). Gordon W. Fassett corroborated Mr. Andrews' testimony (Transcript page 287). Fred Kirchhefer provided unchallenged testimony that his wells in that area have gone dry in the past (Transcript pages 51 and 52).

After remand from the district court, the board incorporated the first findings and made the following additional findings:

a. THAT the Kirchhefer Spring No. 1 is of the same source and in close enough proximity to the Budget No. 2 Ditch, and that Six Mile Creek is limited enough in supply, that it is "very realistic that this junior water right could be regulated." (Testimony of former State Engineer, Gordon Fassett corroborating other testimony, Transcript pages 286–287.)

b. THAT the Kirchhefer Spring's six gallons per minute is significant enough to legitimately belong to the downstream senior's claim. (Testimony of Hydrographer Commissioner, David Andrews, Transcript pages 256–257.)

c. THAT the water commissioner has a duty, when called, to regulate a junior ground water right which is interfering with fulfillment of a senior surface water

right. (Testimony of Hydrographer Commissioner, David Andrews, Transcript page 254).

d. THAT the water commissioner *would* regulate Petitioners' junior water right if a senior appropriator made a call for regulation. (Testimony of Hydrographer Commissioner, David Andrews, Transcript page 224.)

e. THAT Six Mile Creek has experienced historical water shortages and potential shortages are likely to continue due to limited precipitation, runoff and spring flow; and due to reliance upon return flows. (Testimony of Fred Kirchhefer, Transcript page 45; Testimony of Don Nolan, Transcript page 176; Testimony of Donita Kirchhefer, Transcript page 211; and Testimony of Gordon Fassett, Transcript pages 287.)

f. THAT there is no provision in the law that exempts a relative small (*de minimus*) junior water right from regulation if a senior water right places a legitimate call for delivery of the senior appropriation. If the flow contributes to, even if that contribution is bank storage, and is in such proximity that it would reach the calling diversion, the senior is entitled to the regulation of the junior. When there is a call for regulation, a water commissioner cannot choose to regulate the junior appropriations based on their size, but must regulate junior appropriations based on their date of priority.

g. THAT the testimony from the hearing and the record as a whole clearly establishes that the Kirchhefer Spring No. 1 would be subject to priority administration when the Budget No. 2 Ditch appropriation places a valid call for regulation.

h. THAT it is reasonably likely that injury will result to the Petitioner's junior appropriation when a call is placed for regulation of Six Mile Creek for the Budget No. 2 Ditch appropriation. Likewise, the Petitioners' junior water right will be benefited if a call by the downstream Budget No. 2 Ditch cannot be made as a result of abandonment.

The majority of these findings focus on concluding that the Kirchhefers' de minimus ap-propriation would be subject to regulation if a senior appropriator made a call for regulation. Our review of the record indicates that the evidence supports these findings, and the Kirchhefers' appropriation would be subject to regulation if there was a call for regulation. However, the inquiry does not end there. Regulation is always a possibility on such a body of water, and it is clear that in this instance the Kirchhefers will only be injured if a senior appropriator actually makes a call for regulation. Consequently, in this instance, there must be a finding supported by sufficient evidence that there is a reasonable likelihood that regulation will actually occur. Such evidence is absent.

[¶ 14] Indeed, of the above findings, only a and e appear to relate to the reasonable likelihood of regulation. In finding a, the board concludes that the Kirchhefers' well is from the same source of supply as Appellants' appropriation and that Six Mile Creek is limited enough in supply that it is "very realistic" that the Kirchhefers could be regulated. The Kirchhefers' expert, Gordon Fassett, testified that the well was from the same source of supply. In fact, he determined the well was built into the creek bank and, even though the well was a groundwater facility, it was capturing surface water. The only other witness testifying about the source of supply of the Kirchhefers' well was Mr. Andrews. He was not willing to conclude that the well was using the same source of supply because he thought further testing was required to reach that conclusion. He did however admit it was possible. This evidence is sufficient to conclude that both appropriations are from the same source of supply. Certainly, Mr. Fassett's testimony combined with the fact that the well is built into the creek bank presents sufficient evidence to reasonably conclude the water rights are from the same source of supply.

[¶ 15] However, the second part of finding a, that Six Mile Creek is limited in supply, is not similarly supported by sufficient evidence. While Mr. Fassett did testify there was the "opportunity" for there not to be enough water in Six Mile Creek to satisfy the needs of Budget No. 2 Ditch because Six Mile Creek depended on return flows, this

opinion was not based on any volumetric tests, measurements, or historical data of Six Mile Creek. Mr. Fassett did not conduct any such tests but instead simply observed the creek for about half a day. Mr. Fassett did not make any estimate about the volume of Six Mile Creek, other than that there was the "opportunity" for there not to be enough water.

[¶ 16] Fred Kirchhefer, who observes Six Mile Creek every day, testified regarding the creek as follows:

Q.... Since you have been living on the property since 1989, has Six Mile Creek ever dried up?

A. No.

Q. In the last five years, has there been enough water to divert for irrigation purposes where Six Mile Creek enters your property?

A. Yes.

Q. In the last five years, has there been enough water to divert for irrigation purposes where Six Mile Creek exits your property?

A. Yes, there has.

Q. And finally, in the last five years, has there been enough water to divert for irrigation purposes from any point along where Six Mile Creek is flowing across your property?

A. Yes.

He also testified the amount of water in Six Mile Creek varied year round like any other stream, but he did not indicate that this supply was limited. He additionally testified that he had never had trouble getting the water he was entitled to from the well. At one point in his testimony, he testified there was at least half an acre-foot of water in the creek year round, but it is clear that this was not an estimate of the supply of Six Mile Creek. Instead, this was a response to the question of whether there was enough water to fill his application for half an acre-foot stock pond. Mr. Kirchhefer, like Mr. Fassett, indicated he did not know the volume of Six Mile Creek because he had never measured it or had it measured.

[¶ 17] Appellant Sherry Fields testified that her understanding was that when there was enough water in Six Mile Creek it would flow down the Budget No. 2 Ditch, but there wasn't enough water so they simply left the ditch dry. However, Ms. Fields testimony was not based on any observation of Six Mile Creek but simply on her own assumption of how the Budget No. 2 Ditch was supposed to work. By the time Fields owned the property, the flow of Six Mile Creek had been altered so that it no longer flowed past the historical point of diversion.

[¶ 18] Don Nolan, the previous owner of Appellants' property, testified there was only water in the Budget No. 2 Ditch "at times." He stated that any time there was a "good gully washer" or "hard rains" water would flow down the ditch. Mr. Nolan did not testify about the supply or volume of Six Mile Creek. Although the Budget No. 2 Ditch is supplied by Six Mile Creek and therefore the flow of water in Budget No. 2 Ditch might indicate a lack of supply in Six Mile Creek, Mr. Nolan, like Sherry Fields, observed the Budget No. 2 Ditch after the flow of Six Mile Creek had been altered.

[¶ 19] Mr. Andrews was then the only witness to testify about some sort of actual volume for Six Mile Creek. He placed the volume of Six Mile Creek at two c.f.s. based on his observations of the creek. Although the Kirchhefers claim on appeal that Mr. Andrews' observation took place at a point after Six Mile Creek was joined with another creek, it is clear from his testimony that Mr. Andrews thought two c.f.s to be the volume at the point of diversion. Mr. Andrews further testified as follows:

Q. You testified in your deposition that you're vaguely familiar with the water flows of Six Mile Creek over the past five years.

A. Correct.

Q. Six Mile Creek has had fairly constant year-round flow; is that correct?

A. Correct.

Q. No drought conditions occurring in the last five years or have occurred in the last five years; is that correct?

A. No.

Q. With regard to Six Mile Creek stream flow?

A. Nothing that has significantly impacted Six Mile Creek.

[¶ 20]   Looking at the evidence as a whole we conclude that the evidence is not sufficient to reasonably find that Six Mile Creek was limited in supply such that would indicate a reasonable likelihood of regulation. If anything, the evidence seems to indicate more than adequate supply. In reaching this conclusion, it is also helpful to consider the volume of Six Mile Creek and amount of each appropriation. This is considerably easier if we convert the relevant numbers to the same unit of measurement, in this instance gallons per minute. One cubic foot per second equals 449 gallons per minute.[2] The testified volume of Six Mile Creek is two c.f.s., which equals 898 gallons per minute (2 × 449). Appellants' appropriation right is .33 c.f.s, which equals 148.17 gallons per minute (.33 × 449). Therefore, there are 749.83 gallons per minute available to fulfill the Kirchhefers' six gallon per minute right (898—148.17). While we understand that volume does not equal flow, when looking at the appropriations in these terms along with the other evidence, it appears clear that Six Mile Creek is not limited in supply. Instead, the evidence as a whole indicates that there is enough water in Six Mile Creek to satisfy both rights. Therefore, we conclude that there was not sufficient evidence to support finding a.

[¶ 21]   Next we consider finding e, that there were historical shortages which were likely to continue. We likewise conclude there is not sufficient evidence to support this finding. As noted above, there were no drought conditions on Six Mile Creek, Six Mile Creek had never dried up, the Kirchhefers never had trouble getting water from the well, and although it varied, water flowed in Six Mile Creek year round. While there was testimony the Kirchhefers had several deeper wells go dry, there was no indication that Six Mile Creek supplied these wells. In fact, these wells were considerably deeper and were not built into the bank of Six Mile Creek like the Kirchhefer Spring No. 1. Furthermore, while the testimony did indicate that Six Mile Creek relied on return flow, there was no indication that these flows were historically short. We therefore conclude that there was not sufficient evidence that Six Mile Creek experienced historical shortages.

[¶ 22]   Absent these two findings, there are no findings that there is a reasonable likelihood of regulation. Without that, the Kirchhefers' injury is too speculative to indicate a reasonable likelihood of injury or benefit. We therefore conclude that the Kirchhefers failed to meet the standing requirements for filing a petition of abandonment because they did not show that their water right would be affected in some discernible manner. *Joe Johnson,* 857 P.2d at 316. Having concluded that the Kirchhefers do not provide sufficient evidence of standing, we need not address the voluntariness of Appellants' non-use.

### CONCLUSION

[¶ 23]   As explained above, the Kirchhefers did not present sufficient evidence of standing to prevail on a petition for abandonment. Therefore, the district court order upholding the abandonment is reversed, and the case is remanded with directions that the petition for abandonment be denied.

---

2. One cubic foot per second can be converted to gallons per minute using the following equation:

Leonard Rice and Michael White, *Engineering Aspects of Water Law* 169, 185 (John Wiley and Sons 1987).