**GOSHEN IRRIGATION DISTRICT,**
Appellant (Petitioner),

v.

**The WYOMING STATE BOARD OF CON-
TROL and Basin Electric Power Coop-
erative, Appellees (Respondents),**

and

**BASIN ELECTRIC POWER
COOPERATIVE, Appellant
(Petitioner),**

v.

**GOSHEN IRRIGATION DISTRICT
and The Wyoming State Board of
Control, Appellees (Respondents).**

No. 95–162.

Supreme Court of Wyoming.

Oct. 31, 1996.

Kate M. Fox (argued) and Kim D. Cannon of Davis and Cannon, Cheyenne, for Goshen Irrigation District.

Rex E. Johnson and Stephen N. Sherard (argued) of Sherard, Sherard & Johnson, Wheatland, for Basin Electric Power Cooperative.

William U. Hill, Attorney General; Thomas J. Davidson, Deputy Attorney General; S. Jane Caton, Senior Assistant Attorney General; and Frederick E. Chemay, Special Assistant Attorney General (argued), for Wyoming State Board of Control.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN* and LEHMAN, JJ.

LEHMAN, Justice.

Goshen Irrigation District (GID) seeks review of a decision by the Wyoming State Board of Control declaring that 66 c.f.s. of GID's 100 c.f.s. supplemental water right in the Laramie River had been abandoned. Conversely, Basin Electric Power Cooperative (Basin) also seeks review of that decision contending that the evidence demonstrated that GID had abandoned 75 c.f.s.

We affirm in part and reverse in part.

GID presents the following issues for review:

1. Whether Basin is benefitted or injured sufficiently to have standing to bring this partial abandonment action.

2. Whether, in making the determination of benefit or injury, the Board of Control erred in considering unauthorized releases made from the Grayrocks Reservoir by Basin.

3. If the Board of Control has jurisdiction to consider and decide upon equitable matters, whether the Board's decision that it is statutorily precluded from considering such matters is contrary to law.

4. If the Board of Control does not have jurisdiction to consider and decide upon equitable matters, whether GID is entitled to a trial de novo on these issues in the District Court.

5. Whether the Board of Control's declaration of partial abandonment of an appropriation for irrigation use is contrary to law (Wyo.Stat. § 41-3-401(f)) and policy where the appropriator had used all the water available to it at some time during the five years immediately preceding the filing of the action.

6. Whether *Hofeldt v. Eyre*, 849 P.2d 1295 (Wyo.1993), the case which held for the first time that supplemental supply rights are subject to abandonment, should be applied retroactively to partial abandonment actions.

7. Whether the Wyoming legislature's clear expression of intent to support and fund GID's Laramie River pump station must be reconciled with other legislative enactments to modify or otherwise limit the retroactive application of Wyo. Stat. § 41-3-401 et seq. partial abandonment of a supplementary water right.

Basin, on its claim that the Board should have declared an additional 9 c.f.s. abandoned, offers two issues in the form of statements:

1. The evidence relied upon by the Board to find that 34 c.f.s. was pumped by GID on April 1, 1994 * * * was insufficient, speculative, improper and lacked foundation.

2. The test pumping performed by GID on April 1, 1994 did not constitute the required beneficial use of water which will prevent an abandonment under Wyoming Statute 41-3-401(a).

The State Board of Control also filed a brief but contented itself with addressing the issues as presented by the parties.

### FACTS

GID is an irrigation district located in Goshen County. GID is the owner of a 100 c.f.s. supplemental water supply right on the Laramie River with a 1932 priority date. This supply is available whenever GID is in priority and its main appropriation rights on the North Platte River are insufficient.

Basin operates the Laramie River Station power plant near Wheatland, Wyoming. Basin's water permit allows it to store 104,109.6 acre feet of water per year from the Laramie River in the Greyrocks Reservoir. That permit carries a priority date of April 24, 1973 and is junior to GID's supplemental permit.

In 1992, the Wyoming Legislature authorized the construction of a new pump station for GID located downstream from Greyrocks Reservoir. The station was designed to house two pumps, each capable of pumping 34 c.f.s., for a total capacity of 68 c.f.s. The first pump was installed in November of 1993. On April 1, 1994, the pump was used

* Chief Justice at time of oral argument.

to divert water from the Laramie River. The second pump has yet to be installed.

Concerned that the new pumping station might impact the operation of their power facility, Basin sought reassurance from GID. Initially, Basin relied upon a 1975 agreement between GID and Basin on the use of GID's supplemental water right. In that agreement, GID agreed to limit the use of its supplemental supply depending upon the amount of water in the Laramie River. Basin, in turn, agreed not to contest the relocation of GID's point of diversion on the Laramie River. GID, however, informed Basin on May 26, 1992, that the agreement was not binding since the State Engineer and the Board of Control had never approved it. Basin attempted to negotiate an agreement with GID through early 1994, but the parties were unable to find common ground.

Basin filed a Petition for Declaration of Partial Abandonment with the Board of Control on April 7, 1994. The parties stipulated that GID's use of its supplemental water supply during the five previous years was limited to seventeen days in August and September 1990 and that the rate of diversion did not exceed 25 c.f.s. It was also stipulated that GID utilized the new pump with a 34 c.f.s. capacity in November 1993 after its installation and again on April 1, 1994.

After a hearing, the Board of Control concluded that there were times when GID was entitled to use its supplemental supply and there was water available but GID did not divert it. The Board also concluded that the April 1, 1994 diversion was done at the pump's full capacity of 34 c.f.s. Consequently, the Board held that there had been partial abandonment of all but 34 c.f.s. of GID's supplemental water right on the Laramie River.

Both parties have petitioned this court to review that decision.

1. GID contends that the only way Basin could show an injury or benefit is if it relied upon an agreement between Basin and the State of Nebraska allowing for certain releases from Greyrocks to provide a minimum flow of water from the Laramie River into the North Platte River to help preserve habitat for migratory cranes. GID

## DISCUSSION

### 1. *Standing*

GID initially contends that Basin lacked standing to bring an abandonment action because Basin could not demonstrate any injury or benefit.[1] GID argues that if its supplemental water right was not abandoned, Basin would not be injured in any way as there have historically been sufficient flows in the Laramie River to meet its needs. Similarly, GID argues that the abandonment of its water right did not benefit Basin.

Standing is "a jurisprudential rule of jurisdictional magnitude." *Schulthess v. Carollo,* 832 P.2d 552, 556 (Wyo.1992). A party will have standing to pursue a litigation when they have a "personal stake in the outcome of the controversy" which has further been described in our case law as a "tangible interest." *Id.,* at 557. In the context of a petition for abandonment of a water right, the petitioner must allege and prove three facts:

> (1) that he possesses a valid water right of *equal or junior status* to the water right sought to be abandoned; (2) that the water right relied upon by the petitioner and the water right for which a declaration of abandonment is sought are from the *same source of supply;* and (3) that the petitioner stands to *benefit* from a declaration of abandonment *or* to sustain *injury* by reactivation of the contested water right.

*Id. See also* W.S. 41–3–401(b) (Repl.1995). We also held that the Board of Control must make corresponding findings of fact, with support, in order to conclude that a petitioner has standing. 832 P.2d at 557.

In this case, there is no dispute that the first two conditions are met; we are solely concerned with whether the abandonment of GID's supplemental right would confer a benefit on or prevent an injury to Basin. The Board of Control made the following findings of fact regarding benefit or injury:

alleges that the agreement is in violation of Wyoming law and, consequently, cannot be the basis of an injury or benefit for standing purposes. We have resolved the issue of standing without consideration of the agreement and express no view as to its validity.

20. THAT the parties offered a number of computer simulations of the operation of the Greyrocks Reservoir and the lower Laramie River * * *. Each exhibit is a simulation representing the results of a water accounting model of the Greyrocks Reservoir operation and resulting downstream Laramie River flows, each being based on different assumed values of parameters such as the order of use of the various water rights involved, the amount of use by GID under [its supplemental water right], and whether Basin's agreement flow releases would be protected [see fn. 1], among others.

21. THAT the Board found that the most useful of these simulations are found in Exhibits I and M. Those simulations are based on assumed use by GID in the amounts of 100 and 35 c.f.s., respectively, with Basin's agreement releases not protected. Of all the simulations offered as evidence, these simulations incorporate assumptions which most closely approximate the recent operating conditions on the Laramie River at and below Greyrocks Reservoir.

22. THAT the potential injury to Basin's storage which could result from the utilization of GID's supplemental supply right to its full extent of 100 c.f.s., is exhibited by a comparison of the results of the model simulations for 100 c.f.s. and 35 c.f.s. diversions by GID, with Basin's agreement flows not protected, as set forth in Exhibits I and M, respectively. * * * Because the potential injury need not be a certainty, but only one that is not too remote or speculative, the results representing the averages for the 60–year period studied in the simulations, * * * are accepted to present a relatively likely end result. * * *

23. THAT the results depicted in Finding of Fact No. 22, tend to show that if GID diverts 35 c.f.s. under its supplemental supply right rather than 100 c.f.s., greater amounts of permanent storage and end-of-month storage could be available to the Laramie River Station in those months in which GID is most likely to be entitled to use its supplemental supply right, June through September. Even though the simulations performed by GID only allow a comparison of 100 c.f.s. and 68 c.f.s. flows for its supplemental supply right and produced results significantly lower than Basin's simulations, their results also suggest an increase in permanent storage available to the Laramie River Station and end-of-month reservoir storage. Regarding the results of Basin's simulations as an upper limit and the results of GID's simulations as a lower limit, the Board finds that the probable effect upon Greyrocks Reservoir from the utilization of GID's supplemental supply right to its full permitted amount of 100 c.f.s. would lie somewhere between those estimates.

24. THAT Basin has carried its burden of showing that it might be injured by the utilization of GID's supplemental supply right under Permit No. 4883 Enl. to its full extent if that right is not declared partially abandoned.

The foregoing clearly demonstrates that the record supports the determination that Basin possessed standing to pursue abandonment proceedings against GID's supplemental water supply.

### 2. *Equitable defenses*

■ At the hearing, GID sought to interpose the equitable defenses of estoppel and laches to defeat Basin's petition. The Board took evidence and heard arguments but, in its final order, it declared that while it had authority to entertain equitable defenses in contested cases, it would not exercise its equitable jurisdiction in this particular case for reasons of "public policy." The Board reasoned that the policy embodied by W.S. 41–3–401 in allowing for abandonment and the consequent freeing up for appropriation of idle water rights would be hindered if a user could defeat a petition for abandonment based on estoppel or laches. GID counters that the Board erred in not considering its equitable defenses. In essence, GID's position is predicated upon its belief that the policy reasons underlying estoppel and laches outweigh those policy reasons contained in the abandonment statute. Based on a review of the record, we need not decide whether the Board's decision was correct, as we con-

clude that even if a consideration of GID's equitable defenses was merited, GID would not prevail.

GID's equitable estoppel claim relies on the existence of Basin's agreement with the State of Nebraska and its alleged illegality. We have already held that Basin has standing grounded in facts apart from any consideration of the Nebraska agreement. Consequently, since Basin will suffer an injury to its water right if GID resumes full use of its supplemental right, we see no reason why the existence of that agreement should have any effect on Basin's ability to bring an abandonment action.

█ GID also argues that Basin should be barred by the doctrine of laches. GID contends that Basin had full knowledge for at least two years that there were plans to expand its pumping facilities. By waiting until after the pumping station had been completed and one pump installed at considerable expense, Basin's inexcusable delay in bringing this action resulted in substantial prejudice to GID.

█ The defense of laches "is a form of equitable estoppel based on a[n] unreasonable delay by a party in asserting a right." *Squaw Mountain Cattle Co. v. Bowen*, 804 P.2d 1292, 1297 (Wyo.1991); *see also Murphy v. Stevens*, 645 P.2d 82, 91 (Wyo.1982). What GID fails to acknowledge is that throughout the period in question, including right up to the time of the test pump in April of 1994, Basin attempted to negotiate a settlement of their differences with GID. "Laches does not depend on the passage of time alone; the plaintiff must be chargeable with lack of diligence in failing to proceed more promptly." *Golden v. Oahe Enterprises, Inc.*, 90 S.D. 263, 240 N.W.2d 102, 110 (1976); *see also Finlay v. Finlay*, 18 Kan. App.2d 479, 856 P.2d 183, 191 (1993). The record shows that Basin negotiated with the intent of seeking a settlement; laches is unavailable under these circumstances. *See New Hampshire Donuts, Inc. v. Skipitaris*, 129 N.H. 774, 533 A.2d 351, 357 (1987) (laches is not available where plaintiff engaged in good faith negotiations to settle dispute).

### 3. W.S. 41–3–401: Partial Abandonment

█ Finally, GID makes several arguments that the partial abandonment statute, W.S. 41–3–401, is inapplicable under the circumstances of this case. Initially, it contends that our decision in *Hofeldt v. Eyre*, 849 P.2d 1295 (Wyo.1993), which held that supplemental water supply rights were subject to abandonment, should not be applied retroactively.

█ We answered that question, at least implicitly, in our *Hofeldt* opinion, where our decision was applied to the parties in that case. 849 P.2d at 1298. As the specially concurring justice noted:

> The general rule from time immemorial is that the ruling of a court is deemed to state the true nature of the law both retrospectively and prospectively. In civil cases, at least, constitutional law neither requires nor prohibits retroactive operation of an overruling decision, but in the vast majority of cases a decision is effective both prospectively and retrospectively, even an overruling decision. Whether the general rule should be departed from *depends on whether a substantial injustice would otherwise occur.*

849 P.2d at 1298 (Cardine, J., specially concurring) (*quoting Harvey By and Through Harvey v. General Motors Corp.*, 739 P.2d 763, 765 (Wyo.1987) and *Malan v. Lewis*, 693 P.2d 661, 676 (Utah 1984)) (emphasis added). GID has failed to explain to our satisfaction how a substantial injustice would befall it when it had notice that its supplemental right might be subject to abandonment for at least a year after our *Hofeldt* decision and, yet, it took no preventive measures to ensure the safety of its water right.

█ Next, GID contends that partial abandonment of its supplemental supply is statutorily prohibited. GID relies on W.S. 41–3–401(f) as providing an exception to the general abandonment statute, applicable to the situation at hand and rendering the Board's decision in error.

The statute at issue, W.S. 41–3–401(f), provides:

> An appropriation for irrigation use is not subject to partial abandonment for failure

of the appropriator to irrigate part of the lands described in his permit or certificate of appropriation during the successive five (5) year period if:

(i) Facilities to divert the water and to apply it to beneficial use upon the lands which were not irrigated existed in usable form during the period of nonuse; and

(ii) There was not a sufficient supply of water available, because of regulation for prior water rights or because shortage of supply resulted in insufficient water to satisfy the appropriation in full, to irrigate the lands for which abandonment is sought provided that a diligent effort was made to use the supply which was available.

■■■ Contrary to GID's expectations, we find that –401(f) is inapplicable to the instant situation. The statute clearly and unambiguously requires the appropriator to have the facilities in place to make its diversion. We agree with the Board of Control that under the plain language of the statute this means that in order to take advantage of the exception contained within the statute, an appropriator must have facilities capable of diverting their entire appropriation. The intent of the statute is to protect against "partial abandonments" when an appropriator has the facilities in place to make his appropriation but, through factors beyond his control—regulation of the source for prior users or a shortage in supply—a full appropriation is impossible. If an appropriator is protected against partial abandonment even though he does not have the facilities in place to utilize his full appropriation, then a user could simply install a small pump to protect his supply without ever having to divert the remaining portion of his appropriation. This is anathema to Wyoming's statutory water use scheme. See W.S. 41–3–101 (nature of rights and beneficial uses).

■■■ Finally, GID attempts to show, by way of legislative appropriations for its two new pumps, that the legislature did not intend for an interpretation of the law to effect an abandonment of GID's supplemental right. At its heart, GID's argument is that the legislature's appropriations implicitly repealed the abandonment statute. Repeals by implication are not favored. *State v. Sodergren*, 686 P.2d 521, 525 (Wyo.1984). Our task is to determine if the statutes can stand together or if they are repugnant to one another. *Sodergren*, 686 P.2d at 526 (*quoting Bartlett v. State*, 569 P.2d 1235, 1241 (Wyo.1977)). "Where it is evident that a subsequent act seeks to revise the entire subject matter, embracing all that was intended to be preserved in the old and omitting what was not so intended, the last act supersedes the former and repeals it by implication." *Blount v. City of Laramie*, 510 P.2d 294, 296 (Wyo.1973).

■■■ We conclude that the legislature did not intend to repeal the abandonment statute. The United States Supreme Court has spoken persuasively on this issue:

The doctrine disfavoring repeals by implication "applies with full vigor when * * * the subsequent legislation is an *appropriations* measure." *Committee for Nuclear Responsibility v. Seaborg*, 149 U.S.App.D.C. 380, 382, 463 F.2d 783, 785 (1971) (emphasis added); *Environmental Defense Fund v. Froehlke*, 473 F.2d 346, 355 (C.A.8 1972). This is perhaps an understatement since it would be more accurate to say that the policy applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act. We recognize that both substantive enactments and appropriations measures are "Acts of Congress," but the latter have the limited and specific purpose of providing funds for authorized programs. When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure. [This would] lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation[.]

*Tennessee Valley Authority v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 2300, 57 L.Ed.2d 117 (1978). GID has not presented us with any evidence that the legislature was even aware that its supplemental supply was in a state where abandonment proceedings could be brought, let alone that the legislature intended to prevent such a proceeding by its appropriations measures. Under these circumstances, we cannot find an intent by the legislature to repeal a substantive statute through the vehicle of an appropriations bill.

### 4. *Substantial evidence*

 The final issue is raised by Basin, which claims that the decision of the Board of Control to order abandonment of GID's supplemental supply to 34 c.f.s. rather than 25 c.f.s. is not supported in the record by substantial evidence. The basis for the Board's finding of 34 c.f.s. was the April 1, 1994 test of the new pump. Basin asserts that there is no evidence in the record which definitively discloses the amount of water that was pumped on that day as GID did not use any measuring device. Alternatively, Basin argues that the pumping on that day, since it was only a test, was not a beneficial use and only water that is used beneficially is not abandoned.

 We agree that the record does not support the Board's finding and will reverse and remand that portion of the Board's order to require a further reduction of GID's supplemental right to 25 c.f.s.

> We review an administrative agency's findings of fact by applying the substantial evidence standard. Our task is to examine the entire record to determine whether substantial evidence supports the [Board's] findings. We will not substitute our judgment for that of the [Board] when substantial evidence supports [its] decision. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions.

*Amoco Production Co. v. State Bd. of Equalization,* 899 P.2d 855, 857 (Wyo.1995).

In making the determination as to how much of GID's supplemental supply was utilized, the Board found the following:

42. THAT the amount of water pumped on April 1, 1994, was not measured with a Hoff meter or other measuring device.

43. THAT the record contains: (a) testimony that on April 1, 1994, GID's new Peerless pump was running at full r.p.m.; (b) testimony by the hydrographer, Brian Pugsley, that he estimated that GID's new Peerless pump could have been operating at a rate ranging from 30 c.f.s. to 34 c.f.s. during the pumping on April 1, 1994; (c) videotape evidence of the pumping on that date; (d) a stipulation that the capacity of the new Peerless pump is 34 c.f.s.; (e) evidence of subsequent pumping rates experienced by GID in operating that pump; and (f) testimony by Basin's pump expert, Don Brosz, that he had no reason to believe that the Peerless pump did not operate at its maximum rated capacity of 34 c.f.s. on April 1, 1994.

44. THAT based on the evidence identified in Finding of Fact No. 43, the Board finds that GID diverted 34 c.f.s. from the Laramie River on April 1, 1994, under its supplemental supply right, Permit No. 4883 Enl.

The evidence cited by the Board is insufficient to support a finding that the April 1, 1994, pumping was at 34 c.f.s. First, as the Board explicitly acknowledges, the pumping was not measured in any way. Second, the hydrographer did testify that the pump could have been operating in a 30 c.f.s. to 34 c.f.s. range. However, he also testified that: (1) he did not consider himself a pump expert; (2) his original estimate of the flow was greater than the pump's designed capacity; and (3) he stated that his estimate of the rate of flow was "speculation." Third, there is no other evidence in the record from which it can be established what the rate of flow was on April 1, 1994 from that pump.

 For evidence to be sufficient to allow a "reasonable mind" to accept an agency's conclusion, there must appear in the record evidence which allows either a definitive conclusion or a reasonable extrapolation based on the surrounding circumstances. In this case, there is nothing other than "speculation" on which one could form a conclusion as to the amount of water that was pumped on

April 1, 1994. Therefore, the use of the April 1, 1994 pumping as a basis for the determination of the amount of supplemental supply used in the preceding five-year period was error. The maximum figure supported in the record is the 25 c.f.s. to which the parties stipulated that GID diverted in August/September of 1990. Accordingly, the Board erred in not ordering GID's supplemental right abandoned to 25 c.f.s.

## CONCLUSION

We find no error in the Board of Control's decision to order a partial abandonment of GID's Laramie River supplemental water right. However, we conclude that the Board's decision to order abandonment to 34 c.f.s. was unsupported by substantial evidence in the record. We reverse that portion of the Board's Order with instructions to reduce GID's supplemental water right to 25 c.f.s.

* Chief Justice at time of oral argument.