2010 WY 28

**In the Interest of JW and BJ, JR., Minor Children**

**LW, Appellant (Respondent)**

v.

**The State of Wyoming, Department of Family Services, Appellee (Petitioner).**

**No. S–09–0049.**

Supreme Court of Wyoming.

March 18, 2010.

Representing Appellant: Jamie M. Woolsey, Casper, Wyoming.

Representing Appellee: Bruce A. Salzburg, Attorney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; and Susan K. Stipe, Senior Assistant Attorney General. Argument by Ms. Stipe.

Representing Guardian ad Litem: Lori Gorseth, Casper, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1]   The district court entered its "Order on Permanency Hearing" on December 12, 2008.  The process of handling the neglect complaint against the Mother (LW) in this case, which process eventuated in the order cited above, was managed by the Department of Family Services (DFS), the State of Wyoming acting through the District Attorney for the Seventh Judicial District, the Guardian ad Litem for the children affected (GAL), and a Multidisciplinary Team (MDT) created under the child protection statutes and rules and regulations promulgated by DFS. An attorney was appointed to represent Mother.  The persons directly affected by that order will be identified by the use of generic terms/titles in order to maintain the confidentiality of all persons involved, but most especially the identities of the affected children.  The person most directly affected by the order will be referred to as Mother. Although the long-term consequences may be equally as great for the children affected by the order, we mention them second because they are minors and their destiny lies in the hands of the adults involved in this case, which of course includes this Court.  We will refer to the children individually as the Daughter and Son of Mother (and when the reference is to both, "the children").  Each child had a different father, but neither is involved in this appeal.

[¶ 2]   The principal effect of the order at issue here was to permanently place the children with the Foster Parents, who had cared for the children for over one year, with the further intent that Mother's parental rights be terminated and the children adopted by the Foster Parents.  A secondary effect was to eliminate Mother's brother and his wife, who we will refer to as Uncle and Aunt, as the alternative, "kinship" placement for the children as provided for under Wyo. Stat. Ann. § 14–3–208(a)(iii) (LexisNexis 2009), as well as applicable federal statutes and rules and regulations of DFS. Eventually Uncle and Aunt retained counsel to represent them during the permanency hearing.

[¶ 3]   It is Mother's contention that governing statutes and applicable rules and regulations enunciate a strong preference for "kinship/relative" placement in circumstances such as those that arose in this case and that the district court erred in permanently placing the children with the Foster Parents for adoption, rather than with the Uncle and

Aunt. Although termination of Mother's parental rights had not yet been achieved when the appeal herein was perfected, it was a "given" that Mother's parental rights were to be terminated whether the children were placed with the Aunt and Uncle, or with the Foster Parents. We reverse the district court's order and remand to the district court with directions that the children be placed with their Uncle and Aunt, this to be accomplished with all deliberate speed consistent with the children's well-being and under the supervision of qualified professionals in both Wyoming and Montana, the costs of that process to be borne by DFS and Natrona County.

## ISSUES

[¶ 4] Mother raises these issues:

1. Whether the district court erred in ignoring the recognized fundamental right of association of family by ordering permanent placement of the minor children outside the biological family.

2. Whether the district court erred in ordering permanent placement of the minor children outside the home despite a clear Department of Family Services policy and Supreme Court preference that makes relative [kinship/family] placement a priority.

DFS posits these as the issues:

I. Does a mother whose children are in the custody of the Department of Family Services have standing to argue that the familial rights of her brother and sister-in-law have been violated by the court's permanency plan of adoption by the children's foster parents?

II. Did the court properly consider the best interests of the minor children when conducting a permanency hearing?

The GAL states these issues:

A. [Mother] does not have standing to raise on behalf of [Uncle and Aunt] alleged violations of Department of Family Services policies or violations of fundamental rights.

B. The district court correctly ruled that the best interests of the minor children would best be served by placement with and adoption by the Foster Parents.

## FACTS AND PROCEEDINGS

[¶ 5] This appeal presents extraordinarily weighty issues concerning the imminent termination of Mother's parental rights and, thereafter, the permanent placement of Mother's children with the Foster Parents. Mother was essentially a single parent who was raising her two children on her own. The identity of the children's respective fathers was known to the Department of Family Services (DFS), but neither participated meaningfully in the proceedings nor are any issues raised with respect to their parental rights.

[¶ 6] On May 9, 2007, Mother's Daughter was a few months shy of her seventh birthday. Mother's Son was just a few days old. On that date, a petition was filed in the juvenile court asserting that the children had been neglected by their Mother. The children were taken into DFS's care and each was placed with a different foster parent. Among many other things, the petition asked Mother to provide the names of relatives who might be considered as placement options, and she provided the names of Uncle and Aunt. A shelter care hearing also was held on May 9, 2007, and in an order entered on May 23, 2007, the juvenile court placed the children in DFS custody with a primary goal to ascertain if the matter was a "IV–E case," a reference to a provision of the Social Security Act. The GAL was appointed for the children on May 10, 2007, and Mother was appointed counsel on May 30, 2007.

[¶ 7] A June 18, 2007 report of the MDT indicated that the children were returned to the physical custody of Mother and the father of the Son, with DFS retaining legal custody. In a document entitled "Family Service Plan," Mother identified as a part of "Cultural/Ethnic and Family Traditions," going to Montana every other summer to visit Uncle Levi. That same document identified "relative placement with [Uncle Levi]" as a concurrent plan for the children. The "Family Service Plan" assigns many responsibilities to the caseworker (as well as to the

parent(s)), including identifying "cultural, ethnic and family traditions." Mother was assigned the responsibility to "[p]rovide any and all information on an absent parent, relative, or kinship adult." Mother identified Uncle and Aunt in fulfillment of that responsibility.

[¶ 8] The record reveals that four or five successive caseworkers had responsibility for this case over the relatively short time period from intake to permanency hearing, and that the "kinship placement" ball appears to have been dropped by DFS workers during the process. This appears to have occurred in part due to oversight, and in part because Uncle and Aunt lived in Miles City, Montana, a city 300 miles away from Casper. After an Initial Hearing on June 1, 2007, the juvenile court issued an order directing that DFS retain temporary legal custody of the children, with Mother to have physical custody. A Predisposition Report was filed of record on June 28, 2007, and Uncle Levi is mentioned twice in this document. In a letter filed of record on July 3, 2007, it is noted that the children were placed back in foster care with the Foster Parents. The children have remained in that placement until the present time, and they are the Foster Parents identified in the opening paragraph of this opinion.

[¶ 9] On July 18, 2007, the children's grandmother's home was assessed as a potential interim placement for the children, and a recommendation was made that grandmother's home was a suitable home to be considered as a placement for the children. That appears to have been abandoned despite a positive report in a DFS home study, because Mother objected on the basis that her mother was a "drunk" (although she later recanted that characterization).

[¶ 10] The parties to this matter entered into a consent decree that was filed of record on August 8, 2007. Mother admitted the neglect allegations, and the proceedings were held in abeyance while DFS continued to work with Mother to reunite her with her children. Mother's interest in the possibility of placement of the children with their Uncle and Aunt was conveyed to the MDT at its August 30, 2007 meeting. The Foster Parents stressed to Mother that the placement of the children with them was temporary and it was everyone's goal for Mother to get better and resume custody.

[¶ 11] Progress in this matter appeared to be very slow, in significant part because Mother was undergoing in-patient treatment for her drinking problems. The Quarterly Progress Report dated November 8–9, 2007, indicated that the permanency plan was to reunite the children with their Mother and that the contingent permanency plan was to be with "Family Relations." A hearing was held to continue the family reunification plan on February 5, 2008. An order detailing the results of that hearing was entered of record on February 28, 2008. A stipulated order extending the consent decree was entered on March 24, 2008.

[¶ 12] On April 8, 2008, the State and DFS sought to reinstate the original petition and to reinstate proceedings to terminate Mother's parental rights. This change of course was based upon evidence that she had resumed drinking alcoholic beverages and had violated the terms of the contract she had entered into for purposes of reunifying her family in other ways as well. A MDT report filed of record on April 18, 2008, discussed Mother's situation in detail and concluded that efforts to reunify Mother with her children be waived and the "concurrent plan of other relative placement be adopted." In an order entered of record on July 22, 2008, the district court accepted the recommendations of the MDT and directed that the matter proceed to a permanency hearing.

[¶ 13] In a report entered of record on August 1, 2008, the MDT recommended that the parental rights of Mother be terminated (as well as those of the two respective fathers) and that the Foster Parents be granted guardianship of the children. It is in this report that we discover that initial efforts to certify Uncle and Aunt as a family placement had been initiated. On September 5, 2008, Uncle and Aunt filed an affidavit detailing their association with the children, including that Daughter had been in their care for almost 4 years prior to her move to Casper with her Mother, and attesting to the many telephonic and personal efforts they had made to make it clear to DFS that they

wanted to be made responsible for the children. At Mother's request, on October 14, 2008, the district court ordered a "bonding study" to be completed to ascertain the potential for the children to bond with Uncle and Aunt. By report entered of record on October 24, 2008, a MDT report indicated a recommendation that the Foster Parents adopt the children. By order entered on November 14, 2008, Uncle and Aunt were permitted to intervene in this case for the limited purpose of participating in the permanency hearing. It must be noted that the GAL and the attorney for the State resisted each and every effort that Uncle and Aunt made to become included in the proceedings that affected the children.

[¶ 14] Eventually the Uncle and Aunt hired their own attorney and he advocated for them at the permanency hearing. The permanency hearing was conducted on December 1, 2008. That hearing lasted all day and well into the evening hours, and we commend the district court for its efforts to let all parties speak their piece, despite numerous objections and interruption made by the GAL and the attorney for the State. Those objections were directed at limiting the information Uncle and Aunt could bring to the attention of the district court and otherwise to delay, protract, and minimize the amount of information the district court was able to hear. To its credit, the district court overruled almost all objections and allowed Uncle and Aunt to present their plea that the permanency placement for the children be with them.

[¶ 15] The bonding study is a key document in this case because it concluded that it was readily possible that the children could bond with Uncle and Aunt, even though they had also bonded with the Foster Parents. Mother's Son was a focus of much of the study because he had spent very little time with his Mother and even less time with Uncle and Aunt. However, the bonding study bore out that Uncle and Aunt had the skills and the motivation to effectuate a transition for the children from the Foster Parents' home to their home in Montana. The Interstate Compact on the Placement of Children Request, completed by a professional in

Montana, further attested to the skills and abilities of Uncle and Aunt to parent their niece and nephew, as they had done for Aunt's brother in the past, and as they were doing for their own infant child.

## DISCUSSION

[¶ 16] At the outset we take note that the record establishes that there are two suitable, stable and loving families who want to be the permanent placement for the children. One of those families is the Foster Family with whom the children have bonded during the process described above. The other family is that of the Uncle and Aunt who have been available as a placement since the outset of these proceedings. However, they lived in Montana and the reunification process Mother sought to pursue was done in Casper. Thus, the bonds between Uncle and Aunt and Daughter had been interrupted for almost two years, and there was little bond at all with Son. Against this background, the district court had to make an almost literally Solomonic decision as to where the children would be placed, with the Foster Parents or with the Uncle and Aunt. Although we conclude the district court's order was ultimately erroneous, we commend the district court's thoroughness and thoughtfulness, because without it our effort to give meaningful appellate review to this case would have been gravely diminished.

### Mother's Standing

[¶ 17] Both the State and the GAL contend Mother does not have standing to bring this appeal:

"Standing" is short for "standing to sue," which requires a "legally protectible and tangible interest at stake in the litigation." *Olsten Staffing Servs., Inc. v. D.A. Stinger Servs., Inc.*, 921 P.2d 596, 599 (Wyo.1996) (quoting Black's Law Dictionary 1405 (6th ed. 1990)). The phrase "tangible interest" has been equated with the phrase "personal stake in the outcome." *Goshen Irrigation Dist. v. Wyo. State Bd. of Control*, 926 P.2d 943, 947 (Wyo.1996); *State ex rel. Bayou Liquors, Inc. v. City of Casper*, 906 P.2d 1046, 1048 (Wyo.1995). The person alleging standing

must show a "perceptible," rather than a "speculative" harm from the action; a remote possibility of injury is not sufficient to confer standing. *Sinclair Oil Corp. v. Wyo. PSC*, 2003 WY 22, ¶ 13, 63 P.3d 887, 894–95 (Wyo.2003)

*Halliburton Energy Services, Inc. v. Gunter,* 2007 WY 151, ¶ 11, 167 P.3d 645, 649 (Wyo. 2007).

[¶ 18]   Insofar as this appeal is concerned, Mother is on the brink of having her parental rights terminated, but that has not been accomplished yet. Wyo. Stat. Ann. § 14–3–402(a)(xvi) (LexisNexis 2009) provides:

### § 14–3–402.   Definitions.

. . . .

(xvi) "Residual parental rights and duties" means those rights and duties remaining with the parents after legal custody, guardianship of the person or both have been vested in another person, agency or institution. Residual parental rights and duties include but are not limited to:

(A) The duty to support and provide necessities of life;

(B) The right to consent to adoption;

(C) The right to reasonable visitation unless restricted or prohibited by court order;

(D) The right to determine the minor's religious affiliation; and

(E) The right to petition on behalf of the minor.

We conclude Mother has standing in this appeal.

### Standard of Review

[¶ 19]   It is difficult to pinpoint the standard of review that should be applied here because we have a convergence of several issues of constitutional magnitude, as well as clear expressions of legislative intent. The activities of DFS in the arena at hand are guided in part by federal statutes that are a part of the Social Security Act. Of particular importance here is 42 U.S.C.A. § 671(a)(19) (LexisNexis 2008) which provides:

### § 671.   State plan for foster care and adoption assistance

(a) Requisite features of State plan. In order for a State to be eligible for payments under this part [42 USCA §§ 670 et seq.] it shall have a plan approved by the Secretary which

. . . .

(19) provides that the State shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards.

[¶ 20]   The district court found that the only Wyoming statute that discusses relative placement is Wyo. Stat. Ann. § 14–3–429(b)(iii) (LexisNexis 2009), and the GAL agreed with that proposition. That statute provides:

### § 14–3–429.   Decree where child adjudged neglected; dispositions; terms and conditions; legal custody.

. . . .

(b) If the child is found to be neglected the court may:

(i) Permit the child to remain in the legal custody of his parents, guardian or custodian without protective supervision, subject to terms and conditions prescribed by the court;

(ii) Place the child under protective supervision;

(iii) **Transfer temporary legal custody to a relative** or other suitable adult the court finds qualified to receive and care for the child, with or without supervision, subject to terms and conditions prescribed by the court; . . . [Emphasis added.]

[¶ 21]   However, § 14–3–431(m)(i) (LexisNexis 2009) provides:

### § 14–3–431.   Duration of orders of disposition; termination of permanency hearings; petition for termination of parental rights.

(m) When a child has been placed in foster care under the responsibility of the state for fifteen (15) of the most recent twenty-two (22) months the state shall file a petition to terminate parental rights or seek to be joined as a party to the petition

if a petition has been filed by another party, unless:

(i) *The child is in the care of a relative;* [Emphasis added.]

Also see Wyo. Stat. Ann. § 14–3–440 (LexisNexis 2009) (reasonable efforts shall be made to preserve and reunify the family); Wyo. Stat. Ann. § 14–3–427(d)(iv) and (f) (LexisNexis 2009) (court may appoint a relative to MDT; MDT shall give consideration to best interests of family); Wyo. Stat. Ann. § 14–3–201 (LexisNexis 2009) articulates that a primary purpose of child protective services is to "... preserve family life whenever possible ....."; finally, Wyo. Stat. Ann. § 14–3–208(a)(iii) (LexisNexis 2009) provides:

**§ 14–3–208. Temporary protective custody, order, time limitation; remedial health care.**

(a) When a child is taken into temporary protective custody pursuant to W.S. 14–3–405(a) and (b), the person taking custody shall immediately notify the local department of family services office and place or transfer temporary protective custody to the local department of family services office as soon as practicable. The local department of family services office shall:

(i) Accept physical custody of the child;

(ii) Make reasonable efforts to inform the parent, noncustodial parent or other person responsible for the child's welfare that the child has been taken into temporary protective custody, unless otherwise ordered by a court of competent jurisdiction;

(iii) *Arrange for care and supervision of the child in the most appropriate and least restrictive setting necessary to meet the child's needs, including foster homes or other child care facilities certified by the department or approved by the court. When it is in the best interest of the child, the department shall place the child with the child's noncustodial birth parent or with the child's extended family, including adult siblings, grandparents, great-grandparents, aunts or uncles. Prior to approving placement with the child's noncustodial birth parent or extended family, the de-partment shall determine whether anyone living in the home has been convicted of a crime involving serious harm to children or has a substantiated case listed on the central registry established pursuant to W.S. 14–3–213. The department may leave the child in the care of a physician or hospital when necessary to ensure the child receives proper care. A neglected child shall not be placed in a jail or detention facility other than for a delinquent act;*

[¶ 22] The Family Services Manual, Chapter 7 Section B (RELATIVE/KINSHIP CARE AND DILIGENT SEARCH), p. 7–B–5 (2008) articulates a series of guiding principles that stress the importance of kinship care, and item "F" "[r]eflects a priority for placing children, siblings together, with kin whenever out-of-home placement is necessary." It goes on to say that:

By law, relative/kinship families are the placement of preference for children. The Wyoming Program Improvement Plan makes relative and kinship placements high priority for children placed in out of home care ... DFS shall consider relative/kinship families as the placement of preference[.]

DFS is required to make a diligent search for such kinship placements. Throughout this Chapter, the importance of kinship placements is stressed. DFS Policy 5.7 (2008) states that its purpose recognizes:

Relative and kinship placements are less restrictive and therefore preferable to other types of out-of-home care. The DFS caseworker is responsible for conducting an ongoing diligent search for relatives and kin for any child in DFS custody until permanency is achieved. DFS shall consider relative/kinship families as both temporary and permanent resources for children who are unable to live safely with a parent. DFS recognizes that relative/kinship families are important to a child's sense of identity, belonging, and long term connections.

[¶ 23] When an Interstate Compact on the Placement of Children study was finally done, Uncle and Aunt were given extremely

high marks for their ability to take in Mother's children. The Bonding Study done for the permanency hearing also attested to Uncle's and Aunt's ability to bond with Daughter especially, but also with Son (especially when the two children are placed in the same home environment).

[¶ 24] We have repeatedly held that family relations such as those at issue here are fundamental and are protected by principles of constitutional proportions:

> In applying our standard of review, we keep in mind that the right to associate with one's family is fundamental and strictly scrutinize petitions to terminate a parent's rights to his or her children. *C.L.* [*v. Wyoming Dept. of Family Services*, 2007 WY 23], ¶ 9, 151 P.3d [1102] at 1105; *SLB* [*v. JEO*, 2006 WY 74], ¶ 7, 136 P.3d [797] at 799–800; *TF v. Dep't of Family Servs.*, 2005 WY 118, ¶ 15, 120 P.3d 992, 1000 (Wyo.2005). DFS has the obligation to establish by clear and convincing evidence that termination is appropriate. *SLJ* [*v. Dep't of Family Servs.*, 2005 WY 3], ¶ 19, 104 P.3d [74] at 79–80. " 'Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable.' " *Id.*, quoting *MN v. Dep't of Family Servs.*, 2003 WY 135, ¶ 5, 78 P.3d 232, 234 (Wyo.2003).

*R.L.A. v. State of Wyoming, Department of Family Services*, 2009 WY 109, ¶ 13, 215 P.3d 266, 268 (Wyo.2009).

[¶ 25] In *DS v. Department of Public Assistance and Social Services*, 607 P.2d 911, 918 (Wyo.1980) we held:

> In addition, we are helped in our task by a large body of state and federal constitutional law defining the interests individuals have in their family associations. The right to associate with one's immediate family is a fundamental liberty protected by the state and federal constitutions. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (integrity of the family unit protected by the due-process clause of the Fourteenth Amendment); and *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (implication that liberties guaranteed by the federal constitution are fundamental). See, also, *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6, 399 N.E.2d 66 (1980). Analysis of the Wyoming Constitution and case law also leads to the conclusion that the right to associate with one's family is a fundamental liberty. Article 1, Sections 2, 6, 7 and 36, Wyoming Constitution; *Washakie County School District Number One v. Herschler*, Wyo., 606 P.2d 310 (1980); *Matter of Adoption of Voss*, Wyo., 550 P.2d 481 (1976); and *In re Adoption of Strauser*, 65 Wyo. 98, 196 P.2d 862 (1948).

[¶ 26] In *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 97.S.Ct. 1932, 1938–39, 52 L.Ed.2d 531 (also see concurrence 1939–42) (1977) the United States Supreme Court held:

> Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition. Over the years millions of our citizens have grown up in just such an environment, and most, surely, have profited from it. Even if conditions of modern society have brought about a decline in extended family households, they have not erased the accumulated wisdom of civilization, gained over the centuries and honored throughout our history, that supports a larger conception of the family. Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfactions of a common home. Decisions concerning child rearing, which [*Wisconsin v.*] *Yoder* [406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)], *Meyer* [*v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)], *Pierce* [*v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)] and other cases have recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives who occupy the same household indeed who may take on major

responsibility for the rearing of the children. Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life. This is apparently what happened here. Also see 2 Ann M. Haralambie, *Handling Child Custody, Abuse, and Adoption Cases*, §§ 12:31(Kinship care) and 12:32 (Finding an alternative caregiver) (West 2009).

[¶ 27]   Based on these authorities we conclude that, as a matter of ageless tradition, as a matter of federal law, and as a matter of Wyoming law, there exists a compelling preference that what is "best" for a child in circumstances such as those presented here, is placement with nuclear or extended family members.

**Placement with Foster Parents v. Uncle and Aunt**

[¶ 28]   The State and the GAL characterize the kinship care policies articulated by the Social Security Act and DFS as merely precatory, i.e., they are "recommended" and should be "considered." In this case the GAL and DFS claim that they did consider them and determined that they were not feasible because of the geography separating Casper, Wyoming, and Miles City, Montana. We are unable to accept these characterizations given the high stakes in play here. Tools, resources, and an Interstate Compact on the Placement of Children are available to achieve just the result that was "preferred." 2 Haralambie, *supra* at § 12:29 (Interstate Placement and the ICPC). The district court concluded that the outcome of this case was fixed early on in the proceedings when Mother chose to do her "reunification" work in Casper, during which time the children were placed with the Foster Parents. By the time that concluded in failure, the district court found that it was too late to go back and consider the kinship placement. We are unable to agree with those conclusions, although we once again emphasize that the district court was remarkably professional, thorough, and patient in creating a complete record, despite the resistance to the flow of information shown by the GAL and DFS,

and other factors.   For these reasons we are compelled to reverse the district court order.

**CONCLUSION**

[¶ 29]   The order of the district court is reversed and this matter is remanded to the district court with instructions that the children be placed with their Uncle and Aunt, this to be accomplished with all deliberate speed consistent with the children's well-being/best interests and under the supervision of qualified professionals in both Wyoming and Montana, the costs of that process to be borne by DFS and Natrona County.

GOLDEN, J., dissenting, in which
BURKE, J., joins.

[¶ 30]   I respectfully disagree with the majority opinion in several respects.  First, I do not believe Mother has standing to bring the issues in this appeal.  At this stage of the proceedings, there will be no further attempts to reunify Mother with the children. As the majority opinion informs us, termination of Mother's parental rights is a given. Under the circumstances, Mother has no legally cognizable personal stake in the outcome of the determination of the permanency goal for the children.  It is true that, until terminated, Mother retains residual parental rights, but these rights do not include a right to determine the permanent placement of the children.   Certainly, it is appropriate for Mother to have a voice in the proceedings below as to her preference for permanent placement, but that is a far different concept from legal standing to bring this appeal.

[¶ 31]   Further, the issues Mother presents are couched in terms of the constitutional right to familial association.  Her right to familial association is not at issue in this appeal.  Rather, practically, it is Uncle and Aunt's right, if any, that is at issue.  Mother has no standing to present arguments on behalf of Uncle and Aunt. *See In re Adoption of CF*, 2005 WY 118, ¶ 41, 120 P.3d 992, 1005 (Wyo.2005) (Mother has no standing to argue violation of Grandfather's alleged right to familial association).   For these reasons, I would find Mother has no standing to prosecute this appeal and would decline to consider it further.

[¶ 32]   I also have concerns with the remainder of the majority opinion's analysis. The majority opinion seems to accept that Uncle and Aunt have a constitutional right to association with the children. Wyoming has never recognized an uncategorical constitutional right to familial association by extended relatives. I would not concede this point so easily because the recognition of such rights has profound implications. Extended relatives would be entitled to the same procedural and due process protections as parents. Thus, a relative would presumptively be entitled to custody of a related child. The child could not be placed elsewhere without a showing, by clear and convincing evidence, that the relative is incapable of providing an adequate home for the child. No further best interest analysis would be allowed.

[¶ 33]   This presumption in favor of relative placement goes against current Wyoming legislative mandates as expressed in statutes. For instance, Wyo. Stat. Ann. § 14–3–208(iii) (LexisNexis 2009) provides that relative placement is preferred "when it is in the best interest of the child." The Child Protection Act requires the juvenile court to review permanent placement plans to ensure they are in the best interests of the children involved. Wyo. Stat. Ann. § 14–3–431(k) (LexisNexis 2009). These statutory provisions, and others also requiring a best interest analysis, would be unconstitutional as applied to relatives. I do not believe this appeal, given its procedural difficulties and the lack of a comprehensive briefing of this constitutional issue, provides the appropriate backdrop for a determination by this Court of an issue of such great importance.

[¶ 34]   As it now stands, the Child Protection Act expresses a preference for relative placement. This preference tilts the balance in favor of relative placement if all else in the best interest analysis is equal. In this case both Uncle and Aunt and the Foster Parents were acknowledged to be able to provide a safe, nurturing environment for the children. If no other factors were involved, the decision should be for placement with Uncle and Aunt. This case, however, as with all cases, does not exist in a contextual vacuum. The situation was summed up in the report from the bonding study on Uncle and Aunt:

This is a situation in which there are two eminently suitable homes for the children involved. Each home is capable of providing these children with nurturing, comfort and emotional support as well as constructive expectations and the structure and limits children need to grow up to be responsible people. The relevant question in making the placement decision should have to do with whether the desirability of keeping children connected to their family of origin outweighs the potential negative effects of requiring the children to give up the bonds they have formed to one family in order to begin again with a new family. There are many arguments supporting both sides of this question and the decision-making process should focus on how those arguments apply to the particular situation involving [the children]. The answer to the referral question, "do [Uncle and Aunt] have the skills and ability to form healthy attachments with [the children]" is "yes, they do." [Foster Parents] have proven clearly over the course of the past year that they also possess these skills and abilities and have used them to the childrens' benefit. The fortunate thing for [the children] is that whichever direction the Multidisciplinary Team and the Court choose to take in terms of placement for these children, the children will emerge from the foster care system with a home and family that can support their healthy growth to maturity.

[¶ 35]   As mentioned, there were different arguments in favor of each placement. Some of the arguments were discussed in an MDT meeting:

[The assistant district attorney] predicted that the Team members would not unanimously agree on one recommendation, and recommended that [the childrens'] permanency plan should be with the [Foster Parents]. [Daughter's therapist] agreed, and pointed out that [Son] "lost his mom," is attached to [Foster Parents], and should not be separated from them. [The attorney for Uncle and Aunt] noted that [Daughter's therapist] had stat-

ed in a previous MDT that critical bonding occurs in the first three years of life, and asked if [Son] would still be able to bond with [Uncle and Aunt]. [Daughter's therapist] responded that it was possible, but if that occurred, [Son] would experience two losses, the loss of [Foster Parents] and the loss of his mother. She continued that if [Son] remains with [Foster Parents] he would only have one loss, the loss of [Mother]. [The attorney for Uncle and Aunt] asked when [Son] was taken from [Mother], and [Daughter's therapist] responded that although [Son] was only three days old when he was placed in foster care, the loss of his mother would still impact him at some point in his life. [Daughter's therapist] explained that loss could affect a child's brain development as well as having an emotional impact.

[¶ 36] Pursuant to statutory mandates, the juvenile court held a hearing to determine which placement would be in the best interests of the children. The juvenile court took great pains to ensure everyone was able to speak his piece. After the hearing, the juvenile court issued a thorough and very thoughtful order. The possibility of permanent placement with Uncle and Aunt was given full consideration. In the end, however, the juvenile court determined that the permanency plan goal should be placement of the children with Foster Parents for adoption. In doing so, the juvenile court determined all the factors did not weigh equally between the two placements. Of special concern was the age of Son. Son's young age brings into play very real psychological attachment issues. The juvenile court determined removing Son from Foster Parents would not be in his best interest. Daughter also benefitted from the stability she had found in her life with Foster Parents. Whether this Court would make the same decision in the first instance is not the question. I fail to see anything in the record evidence that would allow this Court to find the juvenile court erred in this matter.

[¶ 37] I understand the grief this causes Uncle and Aunt, but minimizing the grief of the children takes priority. The circumstances of this case are unfortunate for Uncle and Aunt. First, they live three hundred miles away from Casper. Thus, it was inappropriate for them to have temporary physical custody of the children while reunification with Mother was the permanency goal. All the parties, including Mother, agreed on this point. Further, for whatever reason, the reality for the children is that visitation between them and Uncle and Aunt was limited during the reunification period. Then there is the age of the children. As noted, their young age, especially Son's, raises emotional developmental issues. These realities can only be ignored at the expense of the children. The juvenile court chose not to do so. This Court should not second-guess that decision.

[¶ 38] Finally, I believe the majority opinion goes too far in outright ordering placement of the children with Uncle and Aunt. At issue in this appeal is the goal of the permanency plan. This is only the beginning of the process. Much remains to be accomplished before permanent placement of the children with Uncle and Aunt becomes a reality, not least of which is the termination of Mother's parental rights. In the meantime, circumstances may change. The juvenile court, the MDT, and the DFS should retain the flexibility to continue to protect the best interests of the children throughout the process.

BURKE, Justice, dissenting, with whom GOLDEN, Justice, joins.

[¶ 39] I join Justice Golden's dissent but write separately in order to focus upon the appropriate standard of review. The majority opinion fails to identify or apply any standard of review. It simply dodges the issue.[1] The proper standard of review is abuse of discretion. Had the majority recognized and applied this standard, it could not have concluded that reversal was warranted.

[¶ 40] Fundamentally, our review process should be the same that we apply in child

---

1. According to the majority: "It is difficult to pinpoint the standard of review that should be applied here because we have a convergence of several issues of constitutional magnitude, as well as clear expressions of legislative intent."

custody cases. In those cases, trial judges must apply statutory factors in making a custody determination that is in the best interests of the children. The same is true here. The juvenile court was required to fashion a placement decision that was in the best interests of the children, taking into account the statutorily recognized preference for family placement. That is precisely what the juvenile court did in this case and that decision should not be overturned.

[¶ 41] In determining whether there was an abuse of discretion, "our primary consideration is the reasonableness of the district court's decision in light of the evidence presented. We view the evidence in the light most favorable to the district court's determination, affording every favorable inference to the prevailing party and omitting from our consideration the conflicting evidence." *Blakely v. Blakely*, 2009 WY 127, ¶ 6, 218 P.3d 253, 254 (Wyo.2009).

[¶ 42] The majority did not apply that standard in its analysis. It did not evaluate the juvenile court's decision in terms of reasonableness based upon the evidence presented. It did not view the evidence in the light most favorable to the juvenile court's determination. It did not afford every favorable inference to the prevailing party and it did not omit from its consideration conflicting evidence. Instead it did just the opposite. It ignored evidence favoring the juvenile court's determination and emphasized the evidence favoring placement with relatives. It ignored the fact that those relatives, who were intervening parties below, did not appeal the decision of the juvenile court.[2] Although the majority takes great pains to recognize the juvenile court's "thoroughness and thoughtfulness," it inexplicably ignores all of the juvenile court's factual findings and analysis. It is the juvenile court's job to weigh the evidence, not ours. We should reverse only when there has been an abuse of discretion. There was no abuse of discretion in this case.

[¶ 43] The juvenile court determined that the best interests of the children would be served by continued placement with the foster parents. There is overwhelming evidence in the record to support that decision. The juvenile court provided a thoughtful, thorough, and convincing explanation of how it arrived at that decision. The court's "Order on Permanency Hearing" is 17 pages long. In that order the court summarizes the testimony of every witness who testified at the hearing. Those witnesses included a counselor, teachers, the foster parents and one of their children, a DFS caseworker, the expert who prepared the bonding study ordered by the court, the uncle, and the Montana Family Resource Specialist Supervisor. After summarizing the testimony and the evidence, the court discussed the applicable law and then applied it to the facts of this case. Here is what the court said:

As noted above, [Aunt and Uncle] contend that DFS's failure to conduct an ICPC [Interstate Compact on the Placement of Children] study in a timely manner, along with DFS policy favoring family or kinship placement require that permanency of [the children] be with them. This Court will first address the issues concerning DFS policies, rules and regulations.

The Wyoming Supreme Court has held that an administrative agency is bound to follow its own rules and regulations. *See MB v. Laramie County Dept. of Family Services*, 933 P.2d 1126, 1130 (Wyo.1997). However, in order for such a violation to be actionable, it must be demonstrated that the violation affected a fundamental right or materially impacted the result. *See In re MN*, 78 P.3d 232, 239 (Wyo.2003) (any non-compliance with DFS rules and regulations was harmless and not shown to have affected mother's fundamental rights or impacted ultimate decision); see also, *In re D.H.*, 173 P.3d 365, 368 (Wyo.2007). In this case, even assuming that the ICPC study should have been conducted more punctually, it does not materially impact the decision reached by this Court. Due to the age of [the children] and the required reasonable efforts to reunify them with [Mother], placement of these children in Casper, Wyoming was essential. These children would not have been placed with [Aunt and Uncle] in Miles City Montana

---

2. The only appealing party is a mother whose parental rights will be, or have been, terminated.

even had the ICPC been timely conducted. In addition, there were no other appropriate family members in Casper, Wyoming to place these children with while reunification efforts were being made. Moreover, to the extent that the DFS did not adequately consider permanency with [Aunt and Uncle] and/or allow visitation during the reunification plan, it has not materially impacted this Court's decision. In order to ensure that [Aunt and Uncle] were given full and complete consideration this Court ordered a bonding study to be conducted and a full evidentiary hearing to be held. Thus, to the extent the DFS failed to give [Aunt and Uncle] sufficient access or visitation this Court's bonding study was designed to make sure they were not prejudiced. Certainly, the case workers involved in this case could and should have done better in communicating and following up. The constant changing of the caseworkers is an ongoing source of reality and frustration for this Court. Nonetheless, these deficiencies do not materially alter this Court's findings. The [die] was cast when [Mother] began to work reunification in Casper, Wyoming, which necessitated the placement of these children with [Foster Parents].

Turning to the issue of a family preference for permanency options, [Aunt and Uncle] cite the Wyoming Supreme Court's decision in *In re, Adoption of CF*, 120 P.3d 992, 1002 (Wyo.2005). In *CF*, the Court was analyzing the mother's argument that DFS should have placed her child with grandfather rather than Foster Parents. The mother claimed that this placement with Foster Parents was "a violation of her birth family's fundamental rights to associate with family and federal law." *Id.* at ¶ 26. In rejecting this argument the Supreme Court noted that mother was judicially stopped from complaining about DFS's failures because she had previously objected to a placement with grandfather. In *dicta* the Supreme Court noted "in general, preference should be given to family placements." *Id.* at ¶ 26. In making this statement the Court cited federal statutes which require the State to consider giving preference to an adult relative over non-

related caregiver. *See* 42 U.S.C. § 671(a)(19). This being said, the only Wyoming Statute which discusses relative placement is Wyo. Stat. § 14–3–429(b)(iii), which notes that if a child is found to be neglected the court may "[t]ransfer temporary legal custody to a relative or other suitable adult the court finds qualified to receive and care for the child,...." Certainly, that does not create a vested right or entitlement to permanency in family members. The question remains what is in the best interest of these children considering all the facts and circumstances.

Many other jurisdictions that have addressed this issue have rejected an argument that family preference is controlling. *In the Matter of B.O.*, 177 P.3d 584, ¶ 15 (Okla.App.2008) (trial court's consideration of statutory factors in determining permanency by foster family adoption, despite existence of relative with a loving bond); *In the Matter of the Adoption of Bernard A.*, 77 P.3d 4, 9–10 (Alaska 2003) (continuity of care by foster parents outweighed access to extended family and mother's placement preference found to carry little weight in determining which adoptive placement was in best interest of child); *In re Adoption of C.D.*, 313 Ill.App.3d 301, 246 Ill.Dec. 180, 729 N.E.2d 553, 560 (2000) (preserving family ties between child and the child's relatives and siblings is important but only one factor to be considered). As noted by one court "the overriding concern of dependency proceedings, however, is not the interest of the extended family members but the interest of the child." *In re Lauren R.*, 148 Cal.App.4th 841, 855, 56 Cal.Rptr.3d 151 (2007). The Court in *Lauren R.*, went on to observe "regardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may required (sic) that placement with a relative be rejected." *Id.* at 855, 56 Cal.Rptr.3d 151. That is the situation before this Court.

For the first time in their young lives [the children], due to no fault of their own, have been placed in an environment that is

stable and nurturing. They are thriving. This placement was not made to defeat or keep family away. Rather it was necessitated in order to allow an alcoholic, drug addicted mother to attempt to reunify with her two month old son and six year old daughter. While these reunification efforts we[re] going on, between June of 2007 and June of 2008, it was neither feasible nor realistic to place these children with [Aunt and Uncle] in Montana. Since [the children] have been placed with [Foster Parents] they have not had to witness domestic violence or excessive consumption of alcohol by their mother or anyone else. They get to count stairs and learn their ABC's in a loving and nurturing home with sisters and a brother. They have, as far as they are concerned, sisters and a brother who love and nurture them. They have, as far as they are concerned, a mother and a father who care for them and love them. In fact, the only parents that [Son] really knows are [Foster Parents]. They are family. [Daughter] is thriving in school and has now caught up to her grade level. She has been able to return to being a child because of the comfort and consistency of her placement. Is a family preference more important than maintaining this environment? This Court, based upon the evidence presented, does not believe so.

As Ms. England aptly noted, does the desirability of keeping these children connected to their family of origin outweigh the potential negative effects of requiring them to give up these bonds to form new ones with [Aunt and Uncle]. The Court concludes that the evidence establishes it does not. All things are not equal. As noted by Ms. Parrish the loss would be significant. While they might overcome this loss, the question remains, why should they have to endure it and be exposed to yet further trauma and loss? Why should that risk be taken? In this case the Court finds that the best interests of [the children] are best pursued by permanency through adoption by [Foster Parents]. Any family preference is outweighed by the bond and relationships [the children] have formed with [Foster Parents] and

even this community. The loss [the children] would suffer if permanency was pursued through placement with [Aunt and Uncle] is not merited. This is not to say [Aunt and Uncle] are not good, sincere people. They are. However, the focus of this issue is on [the children] and their best interests. The Court finds that those best interests are served through a permanency plan of adoption by [Foster Parents].

[¶ 44] I can find no fault with the juvenile court's analysis. There clearly was no abuse of discretion. The children are flourishing in their current environment. There is no legal or factual justification for this further disruption of their lives. The decision should be affirmed.