267 P.3d 1092 (2011)
2011 WY 170
In the Interest of RE and Te, minor children:
Jo, Appellant (Respondent),
v.
The State of Wyoming, Department of Family Services, Appellee (Petitioner).
No. S-11-0088.
Supreme Court of Wyoming.
December 28, 2011.
*1093 Representing Appellant: Mervin W. Mecklenburg, Mecklenburg Attorney at Law, Yoder, Wyoming.
Representing Appellee: Gregory A. Phillips, Attorney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; Jared S. Crecelius, Assistant Attorney General. Argument by Mr. Crecelius.
Guardian Ad Litem: Scott M. Powers, Law Office of Scott Powers, Cheyenne, Wyoming.
Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.
BURKE, Justice.
[¶ 1] Appellant, JO, challenges the juvenile court's order directing the Department of Family Services (DFS) to pursue a termination of Appellant's parental rights. She contends there was insufficient evidence to support a change in the permanency goal for her children. She also claims that DFS failed to provide a compelling reason for recommending termination of her parental rights. We affirm.

ISSUES
[¶ 2] Appellant raises the following issues:
1. Was the Department of Family Services required to provide a compelling reason for recommending a permanency plan of termination over relative guardianship under Wyo. Stat. Ann. § 14-3-431(j)?
2. Did the trial court's order that termination proceedings be filed against the Mother lack evidentiary support?
DFS presents the issues as follows:
1. Did the juvenile court comply with the relevant statutes in finding adoption and termination of Mother's parental rights to be the proper permanency plan for the children?
2. Was there sufficient evidence to support the juvenile court's order on permanency finding that adoption and termination of Mother's parental rights were in the children's best interests?
3. Does Mother have standing to raise the issue of Grandmother's constitutional right to a familial relationship with the children?

FACTS
[¶ 3] Appellant is the mother of TE, born in 2007, and RE, born in 2009. The children's father was in prison at all times relevant to this action. His rights are not at issue in this appeal. On May 6, 2009, when RE was approximately three months old, DFS received a report from medical personnel that RE had been diagnosed with "failure to thrive." When RE was released from the hospital, a social worker from DFS and a public health nurse visited Appellant's home to discuss concerns about the children's care and to schedule medical appointments to monitor RE's health. With regard to RE's physical appearance during this visit, the social worker stated that "He did not look well. He did not look healthy. He was very, very thin. You could see the veins throughout his *1094 body. He justIt was almost like he was immobile." An appointment with a primary care physician was arranged, and Appellant was informed that RE would need to be weighed at a public health clinic twice a week.
[¶ 4] Approximately one week after the initial consultation, the DFS social worker accompanied Appellant to RE's doctor's appointment, where RE was diagnosed with severe bronchitis and failure to thrive. RE was directly admitted into the hospital. While RE was in the hospital, the Torrington Police Department placed both children in protective custody with the children's paternal great uncle and his wife (foster parents).
[¶ 5] The State filed a Petition for Neglect on May 20, 2009. Appellant admitted the allegations at a hearing held on June 2, and the juvenile court entered a decree finding that the children were neglected as defined by Wyo. Stat. Ann. § 14-3-402(a)(xii) (LexisNexis 2007).[1] The court ordered that the children remain in the legal custody of DFS for continued placement in foster care, and that DFS provide visitation opportunities for Appellant, which were to be "increased consistent with the well-being and goal of the children with the objective being reunification when that is in the children's best interest." The court further ordered Appellant to "cooperate with the DFS in developing a Case Plan designed to insure the health, physical safety and emotional well-being of the minor children," and ordered Appellant to comply with all the requirements of the case plan. Finally, the court ordered that a multi-disciplinary team (MDT) be appointed to review the children's personal and family history, and to provide recommendations for the care of the children, giving consideration "to the best interests of the child, the best interests of the family, the most appropriate and least restrictive case planning options and the costs of care."
[¶ 6] Following issuance of the decree, DFS began working on a case plan with Appellant that identified a goal of reunification with her children. At the first MDT meeting, on July 9, 2009, it was noted that RE had gained weight, and that his health had improved significantly under the care of the foster parents. Although Appellant's physician stated that Appellant seemed to be benefiting from medication, he opined that reunification was not yet appropriate and indicated a possible diagnosis of psychosis. At the end of the meeting, the MDT voted in favor of continuing legal custody with DFS and continuing physical custody with the foster parents. The MDT also recommended that Appellant continue with parenting instruction and that she receive a psychological evaluation.
[¶ 7] Over the course of the next twelve months, DFS personnel experienced significant difficulty in procuring Appellant's attendance at scheduled visitations and appointments, and in guiding Appellant's participation during the visitations. On July 19, 2010, an impromptu MDT meeting was held in response to an incident in which Appellant was arrested after a belligerent outburst during a visitation with her children. Appellant's progress as of the time of the meeting was summarized as follows:
[Appellant] has made no progress thus far and we are at 14 months. Interactions between [Appellant] and the kids are severely limited and her main focus still is with [TE] while [RE] fends for himself. [Appellant] refuses any constructive criticism to try to help her improve her parenting, even when it comes to providing healthy snacks for the kids. DFS tried even approaching [Appellant's] attorney so it wasn't coming from DFS. [Appellant] continues to make false allegations regarding the foster parents alleging bruising that is noted by a doctor as normal age appropriate bruising. [Appellant] is inappropriate and rude to staff. On July 2nd, [Appellant] had an inappropriate outburst at DFS that resulted in the Torrington PD *1095 being called and [Appellant] was arrested. Visitations since then were moved to the Torrington PD due to safety concerns.
During the MDT meeting, Appellant's attorney asserted that visitation was not in Appellant's best interest and requested that visitation be stopped. At the end of the meeting, the MDT was evenly divided between a recommendation to terminate Appellant's parental rights and a recommendation to pursue a guardianship with the foster parents. The children's guardian ad litem abstained from voting because he was new to the case.
[¶ 8] Approximately three months later, the juvenile court held a permanency hearing pursuant to Wyo. Stat. Ann. § 14-3-431(d) to determine which permanency plan was in the best interests of Appellant's children. Between the time of the final MDT meeting and the permanency hearing, Appellant had no visits with her children, although her parents continued to see the children. At the permanency hearing, the court heard testimony from three DFS social workers involved in Appellant's case, as well as from two psychologists who had evaluated Appellant. Appellant did not testify at the hearing, but she conceded through counsel that she was "not able to reunify with her children at this time." At the conclusion of the hearing, the juvenile court found that termination of Appellant's parental rights was appropriate. The court summarized its findings as follows:
In looking at the track record in this case, the Court understands that [Appellant] claims for the last three months this [referring to the children's visitations with Appellant's parents] has worked out well, so why not leave it the way it is.
The track record here indicates that that's not likely to continue. In fact, after today's hearing, I will suspect that it would begin again for her to undermine and disagree, and I heard the word "sabotage," or disrupt the stability and permanency for these children.
So the Court finds it appropriate, or the court finds that the state has outlined [its] efforts for reunification, and they were exemplary. The Court finds that the state considered options of kinship placement or some kind of guardianship or termination, and it explained well [its] reasons for selecting the goal of termination; and the Court finds that to be appropriate.
The court subsequently issued an order incorporating the findings set forth above and ordering that "the goal be changed from reunification to termination of the parental rights for the mother of the minor children." This appeal followed.

STANDARD OF REVIEW
[¶ 9] We have had few occasions to review orders such as the one at issue here. On those occasions where we did conduct such a review, we did not articulate a standard of review that would be applicable here. For example, in HP v. State, 2004 WY 82, 93 P.3d 982 (Wyo.2004), we reviewed a dispositional order requiring DFS to proceed with a permanency plan similar to the one adopted by the juvenile court in this case. We applied a sufficiency of the evidence review:
We understand Mother's argument to challenge the sufficiency of the evidence supporting the juvenile court's findings. When reviewing a record for sufficient evidence to sustain a finding of neglect, we:
1. Give considerable deference to the trial court's determination because it has the advantage to judge the demeanor and intelligence of the witnesses;
2. Examine the evidence in the light most favorable to appellee and resolve all conflicts in evidence for appellee;
3. Assume as true the evidence in appellee's favor, disregard entirely appellant's evidence in conflict with appellee's evidence, and give to appellee's evidence every favorable inference that may fairly be drawn.
Id., ¶ 17, 93 P.3d at 987 (quoting DH v. Wyo. Dep't of Family Servs. (In re "H" Children), 2003 WY 155, ¶ 54, 79 P.3d 997, 1012 (Wyo. 2003)).[2]
*1096 [¶ 10] Wyo. Stat. Ann. § 14-3-431(k) provides that "At a permanency hearing, the court shall determine whether the permanency plan is in the best interest of the child and whether the department of family services has made reasonable efforts to finalize the plan. The court shall order the department of family services to take any additional steps necessary to effectuate the terms of the permanency plan." In cases where the trial court is required to make a determination that is in the "best interest of the child," we have regularly applied an abuse of discretion standard of review. This standard applies in adoption cases:
The district court has the power and discretion to grant an adoption without parental consent, provided all the statutory elements are satisfied. In the Matter of the Adoption of SMR, MVC v. MB, 982 P.2d 1246, 1248 (Wyo.1999). This Court reviews adoption decrees by applying the abuse of discretion standard. In the Matter of Adoption of TLC, TOC v. TND, 2002 WY 76, ¶ 9, 46 P.3d 863, 867-68 (Wyo. 2002).
TF v. Dep't of Family Serv. (In re CF), 2005 WY 118, ¶ 10, 120 P.3d 992, 998 (Wyo.2005). It also applies in child custody cases: "We have stated before that `[c]ustody, visitation, child support, and alimony are all committed to the sound discretion of the district court.'" Blakely v. Blakely, 2009 WY 127, ¶ 6, 218 P.3d 253, 254 (Wyo.2009). The fundamental goal in adoption and child custody cases is to arrive at a result that is in the best interests of the child. Similarly, the "best interests of the children" are at the heart of the permanency decision in this case. Accordingly, we will apply the abuse of discretion standard in reviewing the district court's decision.
[¶ 11] In determining whether there was an abuse of discretion, "our primary consideration is the reasonableness of the district court's decision in light of the evidence presented." Blakely, ¶ 6, 218 P.3d at 254.
A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. Our review entails evaluation of the sufficiency of the evidence to support the district court's decision.... Findings of fact not supported by the evidence, contrary to the evidence, or against the great weight of the evidence cannot be sustained. Similarly, an abuse of discretion is present when a material factor deserving significant weight is ignored.
Id., ¶ 7, 218 P.3d at 255. To the extent that our review addresses the proper application and interpretation of the Child Protection Act, our review is de novo. DJM v. DM (In re SRB-M), 2009 WY 22, ¶ 8, 201 P.3d 1115, 1117 (Wyo.2009).

DISCUSSION
[¶ 12] In assessing whether the juvenile court abused its discretion in changing the permanency goal from reunification to termination and adoption,[3] we must evaluate the sufficiency of the evidence to support the court's decision. Blakely, ¶ 7, 218 P.3d at 255. In evaluating the sufficiency of the evidence in a neglect proceeding, we measure the juvenile court's decision against the preponderance of the evidence standard. HP, ¶ 25, 93 P.3d at 989.
[¶ 13] Appellant contends that the court's order was improper "because it was based upon [Appellant's] predicted behavior, rather than upon current conditions." We find no support for Appellant's argument. As set forth below, the bulk of the testimony presented at the permanency hearing related to Appellant's demonstrated inability to care for her children and her counterproductive participation in the original permanency plan of reunification.
[¶ 14] At the permanency hearing, the court heard testimony from three social workers involved in Appellant's case. Their testimony indicated that Appellant's visits with her children were sporadic, and that Appellant failed to attend many scheduled medical appointments and visitations, despite numerous reminders by DFS staff. Initially, *1097 visitation was conducted in the children's foster home, but was discontinued at that location due to Appellant's failure to attend the visitations at the arranged times. Visitation then moved to DFS for a brief period, but was relocated to Appellant's parents' home in Torrington after Appellant moved into their home. The visits were again relocated for a short time when Appellant moved in with a friend in Huntley, Wyoming. In describing those visits, one of the social workers testified that "we did do some visitations out there; but the home was unclean; and it reeked, had a very, very strong odor of ca[t] urine and ammonia. It was unbearable to be in there for 3 hours at a time." Soon after moving to Huntley, Appellant moved back in with her parents, and visitations were continued in Torrington. Although visitation at Appellant's parents' house "started out okay," the quality of the visits deteriorated as a result of anger and frustration directed at DFS staff by Appellant and Appellant's mother. One of the social workers stated that "toward the end, it was constant turmoil, like there was always questioning about the case, people getting mad. [Appellant's mother] would get mad if the visit didn't go the way she wanted." When asked about the disruptions, the social worker testified about one particular instance in which Appellant had requested a visitation for her mother:
WITNESS: [Appellant] got very upset because she requested a visitation for [her] mom. She requested a visitation with the children but had requested it for a short visit; so it didn't give me enough time for arrangements with the foster parents; and she became angry and left the room and began making multiple phone calls and was swearing and cussing DFS around the kids, and using foul language, and I had to redirect her, that she needed to stop or the visit was going to be over.
The social worker further testified that visitation was then moved from Appellant's parents' home to DFS "[m]ainly because of this disruption, because it almost began to feel unsafe if a worker is there by themselves around just [Appellant] and her mother."
[¶ 15] Another social worker testified about an outburst that occurred during a subsequent visitation at DFS. On June 29, 2010, during a scheduled visitation, Appellant took pictures of bruises on TE and indicated that she wanted law enforcement to be called every time she found a bruise. To assuage Appellant's concern, DFS requested that the foster parents schedule a doctor's appointment for TE for the following morning. A visitation was scheduled at DFS immediately following the appointment. When TE arrived at DFS several minutes late due to the doctor's appointment, Appellant became upset. The social worker testified that Appellant "began getting very frustrated and irritated, wanted to know where [TE] was.... She wanted to know where her daughter was, why she wasn't informed of the appointment, began yelling; and I kept telling her that I wasn't going to interfere with her visit at that time. She needed to wait until after the visit and then we can discuss this; and if she continued on I was going to end the visit; and she continued to escalate and get angry and yell." Although Appellant's other child, RE, was present at the visitation, the social worker stated that "Not once did [Appellant] even acknowledge that [RE] was there, even after I suggested that [RE] was here." Eventually, the social worker called law enforcement to respond to the situation, and Appellant was arrested at the DFS office.
[¶ 16] After the incident at DFS, visitation was moved to the police department due to concern for the safety of DFS staff and Appellant's children. At the impromptu MDT meeting held in response to the incident, Appellant's attorney informed DFS that it was not in Appellant's best interest to continue having visitation with the children, and requested that it be stopped. Consequently, Appellant had no visitation with her children for a period of almost three months prior to the juvenile court's permanency hearing.
[¶ 17] Each of the social workers involved in Appellant's case also testified that Appellant did not respond to parenting instruction, and that her inability to parent caused concerns for the children's safety. The social worker who had the greatest amount of involvement with Appellant and her children testified as follows:

*1098 WITNESS: [Appellant] showed poor parenting. She required several reminders to feed the kids, to change diapers, to hold the kids when they would cry, especially [RE], lack of interaction with them. She struggled at times to play with the children, even loving and nurturing, like giving hugs and kisses and attempting to bond with them, again, especially with [RE].
There were times that she struggled with supervising her kids. There were times where I was constantly having to redirect [RE] when he was putting items into his mouth. He would have items in his mouth that could cause choking, and if I wasn't watching him, I don't know what would have happened.
[TE] would leave the room sometimes without [Appellant] noticing until she would hear something in the other room.
She provided lack of response [to] the children. She required constant redirection, relied a lot on others. I noticed when there were others there, like if they were her sister or her mom was there, she seemed to rely on them for kind of picking up the slack.
We tried to role model and suggest to her some parenting; and the reason we tried to do the role [modeling] and so was more of us not telling her what to do, and trying to teach and show her; but she doesn't respond to that.
. . .
COUNSEL: All right. And when you said that you had to redirect often [Appellant's] attention back to her children, where would her attention be?
WITNESS: Sometimes it would be playing on her phone, texting on her phone or on the computer, watching TV, or just spacing out, not paying attention, saying she was sick, didn't feel good, make off in the other room.
COUNSEL: Did you see any improvement when you attempted to model parenting behavior for [Appellant]?
WITNESS: No, and in fact she did make the statement during a visit that she did not like when people told her what to do and that made her not want to do what they asked her to.
The same social worker also testified that Appellant had admitted letting her dog supervise her children, and had stated that "dogs were good baby-sitters." With regard to Appellant's overall development of her parenting skills, the social worker testified that she reviewed the permanency plan with Appellant on several occasions due to her lack of progress:
WITNESS: ... There was still a lot of parenting improvement that needed to be done. There was no stable home environment provided by her for the children. She did not cooperate with the recommendations that were made. And she was not attending all of the visits, missing visits and ending visits or showing up late to them; and she was struggling with having consistent communication with me and just failing to comply with [the] overall plan.
The testimony concerning Appellant's general failure to make progress towards the original permanency goal was corroborated by the other two social workers who provided assistance to Appellant during implementation of the permanency plan.
[¶ 18] The court also heard testimony from a psychologist who met with Appellant on at least three occasions. The psychologist determined that Appellant had "chronic psychiatric issues that ... cause her to be extremely emotionally reactive and to distort reality and make poor judgments." When asked whether Appellant had the capacity to be a suitable parent, the psychologist stated that she had concluded that Appellant had "limited capacity at this time for assuming the roles of responsibility required for becoming a safe and effective parent." With regard to the factors that led to the conclusion that Appellant was unfit to parent, the psychologist testified as follows:
For instance, she, first of all, she had no capacity it seems or willingness to hold herself accountable for the neglect of the children that led to the social service intervention. She tended to blame other people or attribute those to things outside of her control; and she seemed to beShe was emotionally very defensive and hostile, which indicated that she was emotionally *1099 unstable. She had difficulty maintaining an even mood, which [ ] also had a bearing on her capacity to exert concern and be appropriately calm. She was very reactive.
Secondly, her reasoning was impaired. She had a prominent paranoia in her thinking, and she tended to approach things other people said in a very paranoid way which then would affect her judgment and reasoning, leading to bad decisions.
She indicated that she was in many ways, you know, what appeared to be a good parent, but she tended to describe her children more as if they were her possessions rather than people, that people shouldn'tThey had no right to take her children, that sort of thing, rather than being concerned about their safety and well-being and whether she was capable of providing an appropriate environment for them.
Over time she tended to alsoShe would talk about her lifestyle, which was very chaotic and unstable. She had a series of different relationships, and she also hadI am looking through my report that I am using that was dated November 9th. She also hadShe would make allegations that were untrue or rather crazy.
She claimed to have had a relationship with a police officer involved in the intervention, which turned out not to be true.
When asked whether Appellant could "become an adept parent somewhere down the line" with proper counseling and investment in her parenting skills, the psychologist responded that was not likely:
It was my impression that that would be unlikely, that although she can personally benefit from continued individual psychiatric therapy and medication management to stabilize her symptoms, you know, so that she could have a more stable lifestyle, it was my assessment that those interventions would be unlikely to be successful enough within a time frame that would be appropriate for her children to have to wait, if ever.
I assessed her to be very emotionally vulnerable, very vulnerable to sudden disruptions, and she, herself, had too many psychiatric symptoms that are complex that would becould be sufficiently addressed, if they ever could be addressed, to a point that she can be responsible for young children.
Her prognosis with respect to those issues is very guarded.
[¶ 19] Another psychologist was called by Appellant during the hearing. The second psychologist conducted a test of Appellant's intelligence that indicated a reduced level of cognitive capacity. When asked whether that would present parenting challenges, he responded as follows: "It would. Reduced levels of intellectual functioning are often accompanied with reduced judgment and reduced social understanding. I believe it's likely that some of [Appellant's]that a component of her difficulties relating to others and understanding others is probably due in part to her reduced intellectual functioning." Further, with regard to Appellant's general parenting ability, he stated that "I do have concerns just based on my interview and testing with her, and because of her severe difficulties I would question whether she can provide adequate parenting independently to her children."
[¶ 20] Considering the testimony at the permanency hearing relating to (1) Appellant's irregular attendance and lack of engagement at scheduled visitations with her children, (2) her inability to improve her parenting skills over fourteen months of sustained DFS assistance, and (3) mental health problems that were unlikely to resolve through medical intervention "within a time frame that would be appropriate for her children to have to wait, if ever," we find sufficient evidence to support the juvenile court's determination that reunification with Appellant was not in the best interests of Appellant's children. Further, Appellant chose not to testify at the permanency hearing, but conceded through counsel that she was "not able to reunify with her children at this time." Based upon the evidence, we cannot conclude that the juvenile court abused its discretion.
[¶ 21] Appellant also claims that clear and convincing evidence was needed *1100 to support the juvenile court's decision on permanency.[4] She contends that the permanency order impinges on her parents' fundamental rights in the child/grandparent relationship and that, because the rights of extended family members are not addressed in subsequent proceedings relating to termination of parental rights, the court's determination at a permanency hearing must satisfy a higher evidentiary standard. We disagree.
[¶ 22] The children's relationship with their grandparents was a proper factor for the juvenile court to consider in determining the appropriate permanency goal for Appellant's children. However, there is nothing in Wyo. Stat. Ann. § 14-3-431 to indicate that this factor, or the rights of extended family members in general, required the court to apply a higher evidentiary standard at the permanency hearing. As we previously determined in HP, ¶ 25, 93 P.3d at 989, we review the juvenile court's findings "under the preponderance of the evidence standard that is applicable to neglect proceedings." Further, Appellant's right to familial association does not demand application of a clear and convincing evidentiary standard because this is not an appeal from a termination of Appellant's parental rights. As the juvenile court correctly noted in its response to Appellant's claim at the permanency hearing, "The Court is not called upon to make findings by clear and convincing evidence in this hearing. This is not a termination of parental rights hearing. It is a hearing to determine what is the appropriate permanency goal for the children in this case." Indeed, we have previously emphasized that a termination of parental rights proceeding is a civil action filed in district court, separate and distinct from other child protection proceedings held in juvenile court. See HP, ¶ 32, 93 P.3d at 991; In Interest of DG, 825 P.2d 369, 373 n. 5 (Wyo.1992).
[¶ 23] Appellant also ignores the fact that her parents are not parties to this action. In TF v. Dep't of Family Serv. (In re CF), 2005 WY 118, ¶ 1, 120 P.3d 992, 996 (Wyo.2005), the foster parents filed a petition to adopt the mother's child, CF. The mother objected to the adoption, and the grandfather petitioned the court for visitation. Id. The district court approved the foster parents' petition to adopt CF and denied the grandfather's request for visitation. Id. Both mother and grandfather appealed, but the grandfather subsequently dismissed his appeal. Id. The mother claimed that the district court's decision rejecting the grandfather's petition for visitation violated the grandfather's right to familial association. We held, however, that the mother did not have standing to assert a right of familial association on the grandfather's behalf. Id., ¶ 41, 120 P.3d at 1005. We stated that "Although Mother may be concerned about preserving a relationship between CF and her family, she does not have a personal interest in Grandfather's petition for visitation. Mother, therefore, does not have standing to claim that the district court erred by failing to grant Grandfather visitation with CF or to argue that Grandfather's right to familial association was deprived by the district court's order." Id. Similarly, in this context, Appellant is not in a position to assert the grandparents' right to familial association as a justification for the application of a higher evidentiary burden at the permanency hearing.
[¶ 24] Finally, Appellant claims that the court improperly neglected specific sections of Wyoming's Child Protection Act in issuing the permanency order. First, relying on Wyo. Stat. Ann. § 14-3-431(j), Appellant contends that the juvenile court's decision should be overturned because DFS "failed to provide a compelling reason for recommending a permanency plan of termination over relative guardianship." The statute provides as follows:
(j) At the permanency hearing, the department of family services shall present to the court the efforts made to effectuate the permanency plan for the child, address the options for the child's permanent placement, *1101 examine the reasons for excluding other permanency options and set forth the proposed plan to carry out the placement decision, including specific times for achieving the permanency plan. The department of family services shall provide the court a compelling reason for establishing a permanency plan other than reunification, adoption or legal guardianship.

(LexisNexis 2009) (emphasis added). As indicated above, Appellant concedes that the permanency plan was changed to "termination and adoption." Under Wyo. Stat. Ann. § 14-3-431(j), DFS is not required to provide a "compelling reason" for recommending a permanency plan of adoption over legal guardianship. Rather, as the statute clearly indicates, DFS is required to provide a compelling reason for "establishing a permanency plan other than reunification, adoption or legal guardianship." Appellant's arguments to the contrary are unavailing.
[¶ 25] Second, relying on Wyo. Stat. Ann. § 14-3-429(a)(ii), Appellant contends that the juvenile court was required to articulate specific findings of fact supporting its decision to change the permanency plan. That section provides as follows:
§ 14-3-429. Decree where child adjudged neglected; dispositions; terms and conditions; legal custody.
(a) In determining the disposition to be made under this act in regard to any child:
. . .
(ii) If the court does not place the child in accordance with the recommendations of the predisposition report or multidisciplinary team, the court shall enter on the record specific findings of fact relied upon to support its decision to deviate from the recommended disposition.
(LexisNexis 2009). This statute, however, does not apply to a permanency hearing. Rather, the term "disposition," as used in the statute, refers to the initial placement of a child following an adjudication of neglect and a disposition hearing. Accordingly, as the statute governs the initial disposition phase of a neglect action, it has no application to the present case. Furthermore, the reasons for the court's decision to discontinue the permanency plan of reunification with Appellant are clearly set forth in the record.
[¶ 26] Affirmed.
NOTES
[1] Wyo. Stat. Ann. § 14-3-402(a)(xii) refers, in turn, to § 14-3-202(a)(vii), which defines neglect as follows:

(vii) "Neglect" means a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being.
[2] See also LW v. State (In the Interest of JW), 2010 WY 28, 226 P.3d 873 (Wyo.2010), where we did not explicitly set forth a standard of review.
[3] Appellant asserts in her brief that the permanency plan was changed to "termination and adoption." The State agrees.
[4] Appellant contends that "clear and convincing" is the applicable standard of review in this case. Our standard of review, however, refers to the degree of deference accorded to the trial court's decision on appeal. In contrast, the clear and convincing evidentiary standard refers to the burden of proof applicable in the trial court.